IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| APPLICATION OF RICHARD | &#124; |
| CAPLAN REGARDING <u>SALINGER</u> | &#124;   Misc Case No. _____ |
| <u>v. RANDOM HOUSE, INC.</u>, 86 | &#124; |
| Civ 7574-PNL (S.D.N.Y.) | &#124; |
| | &#124; |

**APPLICATION (1) FOR ACCESS TO A JUDICIAL DOCUMENT
ANCILLARY TO <u>SALINGER v. RANDOM HOUSE, INC.</u>, 86 Civ 7574-PNL
(S.D.N.Y.) AND (2) TO CLARIFY THAT THE DEPOSITION OF J. D. SALINGER
TAKEN AS PART OF THAT CASE IS NOT UNDER SEAL**

**I.      Introduction.**

This action respectfully seeks an order that does two things: (1) makes public a District Court-created document from <u>Salinger v. Random House, Inc.</u>, 86 Civ. 7574-PNL (S.D.N.Y.); and (2) clarifies that the deposition of J. D. Salinger taken as part of that case is not under seal. Under both the federal common law and the First Amendment to the United States Constitution, the District Court-created document should be considered a judicial record available to the public. Salinger's deposition transcript should be treated like civil depositions generally are treated and should be able to be shared. Accordingly, an order is sought releasing the judicial document as well as clarifying that the deposition is not under seal.

**II.      Facts and Procedural History.**

Jerome David Salinger, better known as J. D. Salinger, is probably most famous for authoring the 1951 novel <u>The Catcher in the Rye</u>. This Application seeks to make public two documents related to civil litigation initiated in 1986 by Salinger. They are: (1) a judicial document part of that case that was filed by the District Court under seal, and (2) a transcript of Salinger's deposition taken as part of that case.

**A.      Litigation begins involving an unauthorized Salinger biography.**

Around 1986, an unauthorized biography of Salinger by Ian Hamilton was set to be published by Random House, Inc. On October 3, 1986, Salinger initiated a lawsuit against Random House and Hamilton. A key issue in the litigation was Hamilton's use of certain letters written by Salinger in Hamilton's biography of Salinger. <u>See</u> <u>Salinger v. Random House, Inc.</u>, 650 F. Supp. 413 (S.D.N.Y. 1986), <u>rev'd</u> 811 F.2d 90 (2d Cir. 1987); <u>see also</u> Oct. 3, 1986 Tr., attached as Ex.

1

A, at 29:19–20 ("THE COURT: . . . What is Exhibit D? MS. PAUL: Those are the letters themselves."). On the afternoon of October 3, 1986, the District Court held a hearing on the case, which included an application by Salinger for a temporary restraining order and preliminary injunction. (See Ex. A at 3:12–13).

Even before the hearing, Salinger's attorney was focused on secrecy. Attorneys for Salinger and defendants communicated pre-hearing and Salinger's attorneys felt defendants' attorneys were not pledging sufficient secrecy protections, with the result that, at the hearing, Salinger's attorney produced material to the District Court but not to defendants' counsel, Robert Callagy, based on a dispute over secrecy. (See Ex. A at 8:6–23; see also id. at 50:11–12 ("MR. CALLAGY: I haven't seen that. THE COURT: That puts you at a disadvantage.")). At the October 3rd hearing, there is reference to an application filed by Salinger "to file certain exhibits under seal. Those exhibits [include] the two drafts of the manuscripts in question, the letters themselves in question and a comparative analysis . . . ." (Ex. A at 5:14–17; see also id. at 50:6–10). The District Court ultimately stated: "I direct that the exhibits be sealed." (Ex. A at 11:1–2). This comparative analysis appears to be the foundation of the document created by the District Court, as will be further explained. See infra § II.D.

The issue of secrecy continued to dominate the hearing. Immediately following the above, this exchange happened:

> MR. CALLAGY: I must also add that when we supplied—when plaintiff realized that these letters existed, his counsel asked for copies of them and we in good faith supplied them and they proceeded to file them in Washington with the copyright office so they are available there for the public to see as well.
> THE COURT: They can go see them there, then, but not in the court file. . . . So I will grant the application to seal this file. I will direct that the exhibits that are under that order are not to be used by counsel or the parties in any manner except in litigation of the lawsuit. (Ex. A at 11:14—12:8).

**B.     Salinger's deposition takes place days after the case is filed.**

October 3, 1986, when the case was filed and the hearing took place, was a Friday. The following Monday, October 6th, according to the docket, the District Court granted the TRO. (See Ex. B., Doc. 2). A separate docket entry for October 6th notes that the Court, ". . . . Ordered that pltf may file Exh C, D-1, – D-5 , M and O under seal." (See Doc. 3).

Then on Tuesday, October 7th, Callagy deposed Salinger. This fact isn't clear from the docket. On the docket, for October 6th, one of the six entries notes, "Filed Notice of Dep of Harold Ober Assoc, 8 Oct 1986, sub iss." (Doc. 4). At that time, Ober was Salinger's agent. But, while the

docket elsewhere reflects a notice of deposition for an individual (see Doc. 15), the docket never clearly reflects a deposition of Salinger (see Doc., entire). That Salinger himself was deposed appears to have been publicly reported for the first time later in 1986. See Depositions Yield J. D. Salinger Details, New York Times, Dec. 12, 1986.

### C.    The District Court rules and is later reversed by the Second Circuit.

The District Court granted a TRO but subsequently issued an opinion denying the application for a preliminary injunction, finding, most relevant here, fair use. The contents of that opinion are well known and will not be revisited here, except to note that passages from Salinger's letters are included in the opinion. See Salinger, 650 F. Supp. at 419–20, 423. On November 10th, Salinger appealed. (Doc. 20). "The District Court granted a limited stay, which [the Second Circuit] extended pending an expedited appeal." Salinger, 811 F.2d at 94. Ultimately, the Second Circuit reversed on January 29, 1987. The contents of that opinion are well known too, and will not be revisited here, except to note that the Second Circuit also extensively quoted Salinger. See Salinger, 811 F.2d at 93 n.2 (quoting a 69-word excerpt from a 1943 Salinger letter) and n.5 ("A few examples should suffice."). On February 12, 1987, Defendants/Appellants filed a petition for an en banc hearing and also sought to supplement the record. See Salinger v. Random House, Inc., 818 F.2d 252, 252 (2d Cir. 1987) (per curiam), and Salinger, 811 F.2d at 90.

### D.    The District Court creates a document to explain its analysis that becomes the topic of significant debate.

On February 18, 1987—between the filing of the petition for en banc review and the eventual vote denying it on May 4, 1987, see Salinger, 818 F.2d at 252, and Salinger, 811 F.2d at 90—it appears the District Court held a private "chambers conference." See Salinger, 818 F.2d at 253; see also Doc. 25 at 7 (Salinger's attorney referring to "the conference"); Doc. 30 at 1–2 (defendants' attorney referring to "a status conference"). There is nothing on the docket between November 1986 and February 20, 1987, so it is unclear how the District Court provided notice of the February 18, 1987 "chambers conference." No known transcript of this conference exists. The District Court signed two orders on February 18, 1987, although neither were docketed that day. (Compare Doc. 26 (signed Feb. 18, 1987) with Ex. B (Doc. 26 entered on Feb. 20, 1987)); also compare Doc. 27 (signed Feb. 18, 1987) with Ex. B (Doc. 27 entered on Feb. 23, 1987)).

Although no Orders were docketed on February 18th, the Orders signed that day suggest they had immediate effect. In one, the District Court ordered that defendants were "preliminarily enjoined and restrained pending trial and determination of this action, from publishing, distributing, licensing, marketing or otherwise disseminating the book currently entitled J. D. Salinger: A WRITING LIFE or excerpts thereof, in its present form." (Doc. 26 at 2).

The other order states in part: "This filing shall be available only to counsel of record for the parties (Salinger, Random House and Hamilton)." (Doc. 27). The undersigned presumes the language regarding "[t]his filing" only refers to "[t]he passages from Salinger's letters and the Hamilton biography." Accordingly, an image of what appears to be a public part of the Order, with its hand-written footnote to a footnote, follows:



Eventually, the District Court, counsel for both parties, and the Second Circuit either publicly or semi-publicly described what was sealed by the District Court as part of docket entry 27. Salinger's attorney described the sealed material as "an annotated copy of arguably the central exhibit in this case—plaintiff's presentation of the infringing passages of the Hamilton book with the corresponding passages from Salinger's letters," and described the District Court's decision to include the relevant material "as an impermissible attempt to explain the evidentiary record." (Doc. 25 at 8). Defendants' attorney Callagy described the sealed part of the District Court's Order as "simply evidenc[ing] the meticulous procedure employed by the Court in the course of reaching its findings." (Doc. 29 at 2). Callagy added: "Plaintiff's own attorneys provided this document to the Court and invited a line-by-line, word-by-word comparison. Ironically, they are now trying to expunge the evidence that such a comparison was made." (Doc. 29 at 2). At the conference, defendants had "indicated . . . that they strongly favored adding the annotated exhibit to the District Court record." (Doc. 29 at 3). In perhaps the most detailed account of the sealed document, Callagy, in an affidavit, described the document created by the District Court to aid its analysis:

At that conference the Court revealed that in considering plaintiff's motion for a preliminary injunction it had prepared a line-by-line, word-by-word analysis of the 59 passages from Ian Hamilton's book cited by Mr. Salinger as instances of infringement. Specifically, the Court had taken an exhibit prepared by Mr. Salinger's attorneys, which juxtaposed the copyrighted letters and the allegedly infringing portions of the Hamilton biography, and had underlined and color-coded each alleged infringement. The Court had "highlighted" all direct quotations in pink, all impermissibly close paraphrases in yellow, all potentially infringing materials that were not infringements by virtue of recognized exception to copyrightability in orange, and had identified non-protectible ideas and historical facts with blue and green. In addition, the Court had made a number of comments in the margins of the exhibit. The document illustrates the nature of the analysis performed by the Court prior to issuing its opinion and order denying plaintiff's motion for a preliminary injunction on November 5, 1986.

(Doc. 30 ¶ 2). The Second Circuit would later write: ". . . Judge Leval color-coded his copy, meticulously marking the passages in five colors . . . ." Salinger, 818 F.2d at 253.

This document, created to clarify the basis of the District Court's ruling, is key to this Application. It seems, therefore, noteworthy that defendants' counsel called it "of historical interest." (Doc. 30 ¶ 4). The same day the relevant February 18th Order was docketed, the docket reads: "Filed One (1) env ordered sealed and impounded per order of PNL 2/18/87." (See Doc. 28).

After the relevant Order was signed, but before it was even filed, Salinger filed a motion to vacate it. (See Doc. 25). Part of Salinger's opposition was that the "mandate in this action is currently in the Second Circuit Court of Appeals" and, therefore, "jurisdiction over this case has passed from this court to the Court of Appeals." (Doc. 25 at 6–7). A few weeks later, the District Court issued a Memorandum and Order in which it stated it would "vacate the order of February 18, 1987 and will withhold the filing of my detailed findings until the appellate round concerning the preliminary injunction is terminated and the case returns to the district court for consideration of a permanent injunction." (Doc. 31 at 2). In this Memorandum and Order, the District Court described the document under seal as "a complete table setting forth in detail the district court's perception of which words and passages trespass on Salinger's manner of expression and therefore infringe, and which report historical facts and ideas without such infringing trespass." (Doc. 31 at 1). The District Court also described the document under seal as "a table of plaintiff's specifications of infringement annotated to show in detail, word for word, where the district findings of infringement lie." (Doc. 31 at 1).

It appears that, on April 1, 1987, the Second Circuit issued a somewhat secret Order in this case. The Order is available to researchers presently, but the Order states "it shall not be reported, cited or otherwise used in unrelated cases before this or any other court." (Doc. 35, Order at 1). Because the undersigned believes this Application is "related," the Order is quoted from here.

The relevant Second Circuit Order states, "the mandate of this Court shall issue forthwith, restoring jurisdiction concerning the preliminary injunction in the District Court for the limited purpose of deciding whether to add the document to the District Court's record, and it is further ORDERED that, once the District Court has entered an order determining whether the document is to be added to the District Court's record, the mandate of this Court shall be recalled so that we may proceed with consideration of appellees' motion to supplement the record on appeal and appellees' petition for rehearing." (Doc. 35, Order at 2).

Somehow this Second Circuit Order made its way to the District Court. In response, in an order signed April 23, 1987, the District Court "ORDERED that the court's rulings, originally filed by order of February 18, 1987, and withdrawn by order of March 9, 1987, are hereby added to the court's record." (Doc. 33). The docket reflects that the District Court clerk sent a supplemental transmittal to the Second Circuit clerk on April 27, 1987. (Doc. 34). Also on April 27th, the Second Circuit's Deputy Clerk wrote to the District Court Clerk's Office "requesting you return the mandate to me, so that I may hold it pursuant to the Court's order." (Doc. 35). The Second Circuit supplemented its opinion and denied rehearing on May 4, 1987. See Salinger, 811 F.2d at 90, and Salinger, 818 F.2d at 252. On July 16, 1987, the District Court docket reflects the filing of a "true copy of MANDATE" from the Second Circuit. (Doc. 36).

### E.    The case ends by stipulation.

The final entry in the District Court docket is a stipulation and order of discontinuance personally signed by Salinger, counsel for all parties, and the District Court. (See Doc. 37). Most relevant here, this document states: "Nothing herein contained shall alter or affect the various protective orders issued by this Court with respect to the sealing of confidential material in this action, all of which orders shall continue in full force and effect and all of which materials shall remain sealed." (Doc. 37 at 6).

### F.    Congress amends the copyright statute to clarify that the use of unpublished letters can be fair use.

The Second Circuit's Salinger decision was not the last word on fair use of unpublished letters. Immediately, at least some working at the U.S. Supreme Court pushed for granting a writ of certiorari in Salinger. For example, now-Justice Kagan's memo to Justice Marshall

recommending a Join-3 vote is at the Library of Congress; Justice Kagan's memo is not quoted here due to copyright protection.

After the U.S. Supreme Court did not hear the case, work by many to amend the law in response to concerns raised by the Second Circuit's <u>Salinger</u> decision continued, especially after the Second Circuit's decision in <u>New Era Publications Intern., ApS v. Henry Holt and Co.</u>, 873 F.2d 576 (2d Cir. 1989), considered by some to be even more unfairly restrictive regarding fair use and unpublished work than <u>Salinger</u>. <u>See, e.g.</u>, Fair Use and Unpublished Works, S. Hrg. 101–1221, July 11, 1990 (Joint Senate and House hearing on S.2370 and H.R.4263, bills to amend 17 U.S.C. 107). In 1990, Judge Leval published: "I believe the <u>Salinger</u>/<u>New Era</u> position accords insufficient recognition to the value of accurate quotation as a necessary tool of the historian or journalist. . . . Because the copyright generally cannot be enforced without a public filing in the Library of Congress, the very act required to preserve privacy would ensure its violation." Pierre N. Leval, <u>Toward a Fair Use Standard</u>, 103 Harv. L. Rev. 1105, 1114 & 1130 (1990).

Eventually, in 1992, the result was a change to the U.S. Code regarding unpublished letters. Congress amended 17 U.S.C. 107 to add the following: "The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors." <u>See</u> Pub. L. 102–492, Oct. 24, 1992, 106 Stat. 3145.

### G.     Researchers and press have standing to bring actions to promote access.

The right of access is an affirmative, enforceable public right, and the standing of the press and researchers to enforce it is well settled. <u>See, e.g.</u>, <u>Globe Newspaper Co. v. Superior Court</u>, 457 U.S. 596, 609 n.25 (1982); <u>Hartford Courant Co. v. Pellegrino</u>, 380 F.3d 83, 91 (2d Cir. 2004). J. D. Salinger is a public figure and Salinger generally, and his interactions with the legal system specifically, are research areas of interest to the undersigned. Caplan Affidavit, attached as Exhibit C. The undersigned has viewed a nearly complete copy of the transcript and wants to share portions of it but is concerned about doing so because of legal uncertainty. <u>Id.</u> Accordingly, the undersigned has standing to bring and pursue this Application.

## III.     The relevant District Court-created document is a judicial document that should be unsealed.

### A.     The District Court-created document is a judicial document that is presumed public.

A judicial document is an item that is "relevant to the performance of the judicial function and useful in the judicial process." <u>Lugosch v. Pyramid Co. of Onondaga</u>, 435 F.3d 110, 119 (2d Cir. 2006). Deciding whether a document is judicial in nature is resolved by deciding whether such

document is "relevant to the performance of the judicial function," <u>United States v. Bankman-Fried</u>, 2023 WL 1108471, at *2 (S.D.N.Y. Jan. 30, 2023) (quoting <u>United States v. Amodeo</u>, 44 F.3d 141, 145 (2d Cir. 1995) (<u>Amodeo I</u>)), such that it "would reasonably have the tendency to influence" either a court's "ruling on a motion" or "the exercise of its supervisory powers, without regard to which way the court ultimately rules or whether the document ultimately in fact influences the court's decision," <u>Bankman-Fried</u>, 2023 WL 1108471, at *2 (quoting <u>Brown v. Maxwell</u>, 929 F.3d 41, 49 (2d Cir. 2019) (emphasis omitted)); <u>see also</u> <u>Bernstein v. Bernstein Litowitz Berger & Grossman LLP</u>, 814 F.3d 132, 142 (2d Cir. 2016). Documents playing a direct role in the exercise of the Court's power are entitled to a strong presumption of access. <u>Bankman-Fried</u>, 2023 WL 1108471, at *2; <u>see also</u> <u>United States v. Amodeo</u>, 71 F.3d 1044, 1049 (2d Cir. 1995) (<u>Amodeo II</u>).

The relevant document here was central to the judicial process in the underlying <u>Salinger</u> litigation. Already public material in the docket clarifies that Salinger's counsel, defendants' counsel, the District Court, and the Second Circuit treated the District Court-created document as a judicial document at the heart of the underlying litigation. Salinger's counsel conceded the document "explain[ed] the evidentiary record," although alleged the District Court did so "impermissibl[y]." (Doc. 25 at 8). Defendants' counsel said the document set out "the meticulous procedure employed by the Court in the course of reaching its findings." (Doc. 29 at 2). The District Court said the document was created "to show in detail, word for word, where the district findings of infringement lie." (Doc. 31 at 1). The Second Circuit said "[t]he marked exhibit clarifies our understanding of the process by which the District Judge reached the decision challenged on appeal." <u>Salinger</u>, 818 F.2d at 253. The additional material allowed the Second Circuit to state "the District Judge has, in some instances, misapplied the governing standard." <u>Id.</u> at 254. The public has no way to analyze the accuracy of such a statement, for example, without the relevant judicial document itself.

The document sought to be unsealed here is a judicial document that was critical to the District Court's analysis in the underlying <u>Salinger</u> litigation. Further, the Second Circuit relied on and analyzed the District Court-created judicial document. As will be discussed further below, the judicial document should be unsealed when analyzed under both federal common law and the First Amendment to the United States Constitution. Moreover, no countervailing factors support continued sealing.

**B.    Judicial documents are presumed public under both the common law and First Amendment.**

The public's common law right of access to judicial records is well established. Judicial documents are presumed to be accessible to the public. <u>Lugosch</u>, 435 F.3d at 119. That presumption can vary based on, for example, the purpose of the document, but judicial documents should only

be withheld if countervailing interests outweigh the public's right of access. Id. Relatedly, the legal principles governing the First Amendment right of access provide another, independent basis for making judicial documents public. Id. (common law and constitutional right to judicial documents in civil case); United States v. Suarez, 880 F.2d 626, 630 (2d Cir. 1989) (First Amendment right to judicial documents in a criminal case).

The weight of the presumption of access to a specific document varies based on "the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." Lugosch, 435 F.3d at 119 (quoting Amodeo II, 71 F.3d at 1049) (internal marks omitted). Once the court has determined the weight of that presumption, it must then balance the value of public disclosure against "countervailing factors." Bernstein, 814 F.3d at 143.

**1.     The judicial document should be considered public under the common law.**

The presumption of access to judicial documents is strong under the federal common law. "The common law right of public access to judicial documents is firmly rooted in our nation's history." Lugosch, 435 F.3d at 119. The logic behind the presumption makes sense: the more complete a court's record, the more capable the public is of monitoring a court's decision. As the Second Circuit has explained: "Such monitoring is not possible without access to testimony and documents that are used in the performance of Article III functions." Amodeo II, 71 F.3d at 1048.

In this case, there is a particularly high presumption of common law access. As noted, counsel for plaintiff and defendants acknowledged the judicial document's value to understanding the District Court's analysis. The judicial document was used by the District Court to reach its conclusion, and it was used by the Second Circuit to evaluate that conclusion on appeal. Where documents directly affect an adjudication or are used to determine litigants' substantive legal rights, the common law presumption of public access to the documents "is at its zenith," and can be overcome only by extraordinary circumstances. See Bernstein, 814 F.3d at 142.

**2.     The relevant document should be considered public under the First Amendment.**

The First Amendment also requires public access to the relevant judicial document. The legal principles governing the First Amendment right of access to judicial records are equally well settled and provide a second and independent basis for unsealing. Lugosch, 435 F.3d at 120. The constitutional right attaches to records that meet a two-part test, based on "experience" and "logic." See Press-Enterprise Co. v. Superior Court of California, 478 U.S. 1, 9 (1986). With respect to the experience prong, a court should examine whether the records "have historically been open to the

press and general public." Id. at 8. Court orders on summary judgment motions have historically been open to the public; it is the rare exception they are not. Regarding logic, a court should examine "whether public access plays a significant positive role in the functioning of the particular process in question." Id. As set out above, as a matter of logic, access to judge-created documents in civil cases that are used to decide dispositive motions aids the public in monitoring a court's use of its Article III powers. Where, as here, the First Amendment right of access should attach, the judicial document cannot be kept from the public "unless specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" See id. at 13–14 (quotation marks omitted). "Broad and general findings by the trial court, however, are not sufficient to justify closure." Lugosch, 435 F.3d at 120 (quotation marks omitted).

### C.    No countervailing factors override the presumption that the relevant judicial document should be available to the public.

#### 1.    There is a high threshold to meet for keeping judicial documents in a civil case sealed.

Notwithstanding the presumption of access under both the common law and the First Amendment, a judicial document "may be kept under seal if 'countervailing' factors in the common law framework or 'higher values' in the First Amendment framework so demand." Lugosch, 435 F.3d at 124. If a court concludes "that the more stringent First Amendment framework applies," as should be the case here, "continued sealing of the documents may be justified only with specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim." Id. (citing In re New York Times Co., 828 F.2d 110, 116 (1987)).

"[A]fter determining the weight of the presumption of access, the court must balance competing considerations against it. Such countervailing factors include but are not limited to the danger of impairing law enforcement or judicial efficiency and the privacy interests of those resisting disclosure." Lugosch, 435 F.3d at 120. Impairing law enforcement is not relevant here. There does not appear to be reasonable concern about this Application having any significant impact on judicial efficiency; hopefully this Application can be concluded quickly, despite it coming years after the case was initiated. In addition to privacy, the potential countervailing consideration of copyright is discussed below as well.

**2.    If the judicial document is sealed because it contains publicly available copyrighted material authored by Salinger, it should be unsealed.**

It is anticipated that if there is opposition to the release of the judicial record here, a key argument will be that the judicial record contains excerpts from copyrighted letters authored by Salinger. However, Salinger's letters are available to the public, and the mere fact they are copyrighted should be of no moment here. See, e.g., Jacobs v. J. Publ'g Co., 2022 WL 540955, at *2 (D.N.M. Feb. 23, 2022) ("Nor is the simple fact that the case involves copyright infringement sufficient, in and of itself, to place documents under seal; for example, other cases of copyright infringement that sealed records dealt with trade secrets, which are not at issue in this case.").

The relevant judicial document appears to have been sealed, at bottom, because it contained material from letters authored by Salinger that were available to the public, but not easily available. (See Ex. A at 11:14—12:8). That is not a good enough reason under the law to keep the relevant judicial document sealed. "[T]he already-public nature of these documents weakens" any argument to restrict public access to the relevant judicial documents because they may contain copyrighted material. Jacobs, 2022 WL 540955, at *2. "In general, courts have declined to seal, or have unsealed, records when the information is already publicly accessible." Id. at *3. Here, the focus is on copyrighted letters Salinger authored that have been available for public viewing for decades. "The fact that [Salinger] admits that the information from those [letters] has already been made publicly accessible supports a finding that [Salinger] has not met the heavy burden of showing a significant or substantial interest that outweighs the strong presumption in favor of public access to the" relevant judicial document containing excerpts from some letters. See Mastriano v. Gregory, 2024 WL 4003343, at *4 (W.D. Okla. Aug. 26, 2024).

A judicial document should not be sealed to prevent the public from seeing material already available to the public. After Salinger wrote and mailed letters to others, relevant letters were apparently given or sold to locations and made available for viewing (often with conditions). Simply because Salinger later copyrighted relevant letters, material in those letters should not be a basis for the sealing of the relevant judicial document. By seeking money damages and injunctive relief in a court of law, Salinger subjected himself to public court proceedings, including any consequences of further public disclosure of material from the letters. See Brown v. Advantage Eng'g, Inc., 960 F.2d 1013, 1016 (11th Cir. 1992) ("Once a matter is brought before a court for resolution, it is no longer solely the parties' case, but also the public's case."); see also Mann v. Boatright, 477 F.3d 1140, 1149 (10th Cir. 2007) (denying sealing where "much of the information contained in [plaintiff's] complaint appears to have been previously disclosed in public probate court proceedings, further undermining her privacy concerns").

To the extent the relevant judicial document here was sealed because it contained copyrighted material by Salinger, or remains sealed for that reason, it should be unsealed. "In

considering whether sealing is appropriate, an important consideration is, of course, whether the information sought to be kept confidential is already public." United States v. Avenatti, 2020 WL 70952, at *6 (S.D.N.Y. Jan. 6, 2020). As far as can be understood without viewing the judicial document, it appears to be excerpts from Salinger letters, Hamilton's use of those letters (quotation, paraphrase, etc.), and notes by the District Court. Defendants indicated no objection to making the document public at the time. If there was or is an objection from Salinger about unsealing, it would appear to be, in part, because Salinger copyrighted relevant letters. Because it appears any material from the letters is already available to the public, this objection would appear without merit. Accordingly, to the extent the judicial document is under seal in whole or in part due to the copyright of publicly available letters authored by Salinger, the seal should be lifted for that reason.

### 3. If the judicial document is sealed because of privacy concerns, it should be unsealed.

Privacy can be an important consideration in sealing. But even in the privacy context, the burden rests on the proponent of secrecy to establish that countervailing factors should set aside the public's right of access. See, e.g., Bernstein, 814 F.3d at 143; Mastriano, 2024 WL 4003343, at *4; Lugosch, 435 F.3d at 124. Here, there appears no way to establish that burden.

In the past, perhaps there was an argument to be made regarding sealing some material for the sake of Salinger's privacy. But no more. As noted, copyright law has changed. See supra § II.F. Further, Salinger died in January 2010. Just months after Salinger died, other letters by Salinger were exhibited without issue. See The Morgan Library & Museum, Letters by J. D. Salinger, available at https://www.themorgan.org/exhibitions/letters-by-salinger ("The Morgan restricted access to the letters during Salinger's lifetime in deference to the author's widely known desire for privacy. Now that the restriction has been lifted, the letters are to be exhibited for the first time and will be available to scholars."). By 2019, letters by Salinger were exhibited with assistance from the J. D. Salinger Literary Trust. See The New York Public Library To Present Items From J. D. Salinger's Archive, Oct. 7, 2019, available at https://www.nypl.org/press/new-york-public-library-present-items-jd-salingers-archive. Here, it appears any letters quoted from in the underlying Salinger litigation are already available to the public. Anyone, for example, should be able to make an appointment to go to the Library of Congress to view and read them. Sealing a judicial document in a civil case because it contains excerpts from public letters is not supported by precedent.

There are no reasonable privacy concerns for Salinger or anyone else that should override the presumption that the relevant judicial document is public. To the extent any salacious facts are in the letters, they can and likely already have been mined; at issue in Salinger was the verbatim or paraphrased use of the letters. Regardless, there is no legal reason to seal letters even if privacy was a concern for Salinger when the decision to seal was made. See Hillsboro Feed Co. v. Biro, 2013 WL 12329129, at *1 (D.N.M. Sept. 17, 2013) (declining to seal judicial records that included

"highly-personal, unflattering details" about personal relationships and allegations about a party's mental health. The same should apply to any third-party privacy claim. See United States v. Basciano, 2010 WL 11679716, at *4 (E.D.N.Y. May 12, 2010) ("Shielding third parties from unwanted attention arising from an issue that is already public knowledge is not a sufficiently compelling reason to justify withholding judicial documents from public scrutiny."). In sum, Salinger walked into a courthouse and filed a civil suit that included certain public documents as attachments. Those documents cannot continue to serve as the basis for a sealing order. "Once a matter is brought before a court for resolution, it is no longer solely the parties' case, but also the public's case." Brown, 960 F.2d at 1016.

## IV.    The District Court should clarify that Salinger's deposition is not under seal.

### A.    As there is no order clearly sealing Salinger's deposition, this court should find that the deposition is, therefore, not under seal.

Salinger's deposition was never clearly ordered under seal on the docket by the District Court and, therefore, it is not legally under seal. At the October 3, 1986, hearing, the District Court stated that a sealing order could be made for the deposition. (See Ex. A at 73:8–76:21). However, no party clearly asked for such an order on the record, no relevant motion appears to have been filed, and the docket reflects no such order explicitly for the deposition. With no such order here, Salinger's deposition transcript is not under seal and the undersigned requests that this court issue an order clarifying that reality. "We must also unseal the contents of the docket for a more quotidian reason: under our Circuit's Local Rules, a document may be sealed only if it was either placed under seal by order of a district court, or placed under seal by order of this Court upon the filing of a motion." In re Demetriades, 58 F.4th 37, 46 (2nd Cir 2023) (quotation marks omitted, citing 2d Cir. Loc. R. 25.1(a)(1)(E)).

### B.    Because much of Salinger's deposition is public, this court should clarify that the deposition as a whole is not under seal.

Many pages from Salinger's deposition have already been published. See J. D. Salinger: The Last Interview and Other Conversations, edited and with an introduction by David Streitfeld (Melville House Publishing 2016), at xii ("The public part of his deposition in his lawsuit is printed here in full for the first time anywhere. (The second part was sealed.))". Approximately the first 40 pages have been available to researchers at Princeton University for years as well.

Additional pages from Salinger's deposition appear to have been attached to dispositive pleadings and have been available to researchers at the archives of the Second Circuit. See Ex. C. The numbered pages of Salinger's deposition at the archives appear to begin in the 40s and appear to end on page 227, when Callagy says he has no more questions. Under the law, all of these

deposition pages are public. "[D]ocuments submitted to a court for its consideration in a summary judgment motion are—as a matter of law—judicial documents to which a strong presumption of access attaches, under both the common law and the First Amendment." Lugosch, 435 F.3d at 121. "Summary judgment filings should not remain under seal 'absent the most compelling reason' or 'absent exceptional circumstances' because the act of formal adjudication should be subject to public scrutiny." Rojas v. Triborough Bridge & Tunnel Auth., 2022 WL 773309, at *1 (S.D.N.Y. Mar. 14, 2022) (quoting Lugosch, 435 F.3d at 121). The fact that a summary judgment motion includes deposition transcript testimony does not change the equation. See Rushford v. New Yorker Magazine, 846 F.2d 249, 253 (4th Cir. 1988) ("Once the documents are made part of a dispositive motion, such as a summary judgment motion, they lose their status of being raw fruits of discovery.") (quotation marks omitted).

There does not appear to be any reason that the deposition would qualify for sealing under governing legal standards. First, as discussed, it appears the District Court's summary judgment analysis relies on the factual information submitted by the parties to determine the litigants' rights, so the public has a strong interest in accessing the information. Second, a good portion of the factual information appears publicly available through other sources. And third, most of this information is quite stale—the deposition took place in 1986 and discussed, in part, letters written many years earlier. This court should find that the public's right to access the deposition is greater than any privacy or copyright interest that Salinger might assert over the deposition.

### C. Notable depositions in civil cases that are not sealed are presumed publicly accessible.

Depositions in civil cases that can be helpful to others and are not under seal are regularly shared, and the result should be no different here. For example, Westlaw currently contains an "Expert Materials" database filled with depositions. A search for "medical malpractice" appears to yield over 9,000 depositions; one for "antitrust" appears to yield over 11,000. If depositions can be shared among practitioners when there is demonstrated utility, a deposition should be able to be shared when it is not under seal and can be used to research a figure of notable literary importance. Without clarity from this court, sharing the deposition is not possible at present because of fear of litigation. See Ex. C.

### V. Request that Judge Leval preside over this Application.

It is requested that United States Court of Appeals for the Second Circuit Senior Judge Pierre N. Leval be assigned this Application. "The chief judge of a circuit or the circuit justice may, in the public interest, designate and assign temporarily any circuit judge within the circuit, including a judge designated and assigned to temporary duty therein, to hold a district court in any district within the circuit." 28 U.S.C. § 291(b). The public interest is especially served when a

circuit judge can temporarily preside over a case over which he presided originally as district court judge, as would be the case here. <u>See</u> <u>United States v. Bradley</u>, 124 F.4th 106, 111 (2nd Cir. 2024). There can be no reasonable debate about Judge Leval's knowledge about the underlying <u>Salinger</u> case. <u>See, e.g.</u>, <u>Romanova v. Amilus Inc.</u>, 138 F.4th 104, 111 n.3 (2nd Cir. 2025) (Judge Leval referencing the underlying 1987 <u>Salinger</u> decision); <u>Authors Guild v. Google, Inc.</u>, 804 F.3d 202, 212 n.13 (2nd Cir. 2015) (same); <u>see</u> <u>also</u> Leval, 103 Harv. L. Rev. 1105.

## VI. Conclusion.

Based on the foregoing, applicant requests an order (1) unsealing the relevant judicial document, (2) clarifying that Salinger's deposition is not under seal, and (3) taking any other action the court deems appropriate and necessary.

<u>/s/ <i>Richard Caplan</i></u>
Richard Caplan
1100 Peachtree Street NE
Suite 200
Atlanta, GA 30309
rcaplanprose@gmail.com
470-317-2500
Pro Se

# Ex. A

DOC # 22

eo

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    -------------------------------x

3    JEROME D. SALINGER,
     a/k/a J. D. SALINGER,
4
                    Plaintiff,
5
               v.                        86 Civ. 7574 (PNL)
6
     RANDOM HOUSE, INC., and
7    IAN HAMILTON,

8                   Defendants.

9    -------------------------------x

10                                       October 3, 1986
                                         12:15 p.m.
11

12   Before:

13           HON. PIERRE N. LEVAL,

14                                       District Judge

15

                       APPEARANCES
16
     KAYE, COLLYER & BOOSE,
17       Attorneys for plaintiff,
     MARCIA B. PAUL,
18   M. GALSAN COLEMAN,
     R. ANDREW BOOSE,
19                   Of Counsel

20

     SATTERLEE & STEPHENS,
21       Attorneys for defendants,
     ROBERT M. CALLAGY,
22   MARC A. FOWLER,
                     Of Counsel
23

24

25

eo

1          (In the robing room)

2          THE COURT:  I want to place on the record before

3    we begin that I have known Mr. Boose for a number of years

4    socially.  I don't know him very well, but we have a

5    friendly relationship.

6          I guess I met you how many years ago, twenty

7    years ago?

8          MR. BOOSE:  Perhaps.

9          THE COURT:  Mr. Boose was a partner of Allen

10   Schwartz, who is a friend of mine.  We have seen each other

11   at parties maybe once every two or three years since that

12   time.

13         If anybody wants to request further information

14   on that or to make any suggestion or motion that you think

15   appropriate, you are most welcome to do so.

16         I think Mr. Boose has had litigation before me

17   and I would think, off the top of my head, knowing him

18   doesn't have any bearing on my ability to sit as a judge on

19   a case he is involved in, but don't be the least bit

20   hesitant to raise the question or ask for more information

21   if you think it would be helpful.

22         Both sides should take up the fact with their

23   clients so that their clients participate in the decision

24   whether they want to pursue the issue any further.

25         I would add also that Ms. Paul has had

eo

3

1   litigation before me, as has Mr. Callagy, maybe others of

2   you as well.  I don't remember right now.

3          Does anybody want to dwell on that question any

4   further?

5          MR. CALLAGY:  I believe on behalf of Random

6   House we are satisfied with your impartiality.  It turns

7   out that Andy and I were classmates in college, so we go

8   back a long way, too.

9          THE COURT:  Don't be the least bit hesitant to

10  raise the issue further.  The only thing I would say,

11  however, is that if the issue is to be raised further, it

12  should be done promptly, because this is an application for

13  a temporary restraining order and preliminary injunction

14  and this is likely to be a rather fast moving action.

15         It could just as well be Mr. Boose's side as Mr.

16  Boose's adversaries that take the side that they don't want

17  me because I have had personal contact with a lawyer, but

18  it should be based on those facts and not on the sense that

19  the judge may have inclinations to favor the other side of

20  the legal controversy.

21         So if anybody wants to raise the matter further,

22  you are most welcome to do so.  Don't be hesitant.  But it

23  should be done promptly.

24         MS. PAUL:  As long as your Honor stated that it

25  is something that could be raised by both sides, I would

1    like to state for the record that we have no objection.

2            I would also like to query.  I understand Mr.

3    Callagy is appearing here today on behalf of both Random

4    House and Mr. Hamilton and I noted in stating your position

5    with respect to the question the judge posed you responded

6    on behalf of Random House.

7            MR. CALLAGY:  We have cross-moved to dismiss the

8    copyright claim and of course we have opposed the

9    application for a temporary restraining order and a

10   preliminary injunction on behalf of the defendants.

11           MS. PAUL:  Both defendants?

12           MR. CALLAGY:  That is correct.

13           MS. PAUL:  Thank you.

14           MR. CALLAGY:  The author Hamilton who wrote the

15   book in issue resides in London.

16           MS. PAUL:  He has been given notice, however, by

17   letter delivered to his home on Wednesday of this week that

18   we would be in this court this morning appearing here on

19   this application.

20           I would also like to raise a preliminary matter --

21           THE COURT:  I would add I don't think I know Ian

22   Hamilton.  His name is familiar, but I think that is more

23   likely to be from the fact of his biography of Lowell or

24   some of his works on poetry.  It is conceivable that I have

25   met him, but I don't think I have.

eo

5

1          MR. CALLAGY:  He also has been a lecturer and

2     professor at various U.S. universities in the literature

3     department, so you may have run across him in that way.

4          THE COURT:  I guess I should also add that I

5     have read works by J. D. Salinger.

6          Okay.  Now, I have rather hastily read the

7     briefs of both sides and have read a little bit of the

8     affidavits submitted.  I haven't had a chance to read them

9     all, but I thought I would get you in without holding you

10    up too much longer and give you the opportunity to state

11    your positions.

12         MS. PAUL:  Your Honor, if I may start with a

13    preliminary matter.  We have included in our order to show

14    cause an application that we be permitted to file certain

15    exhibits under seal.  Those exhibits are the two drafts of

16    the manuscripts in question, the letters themselves in

17    question and a comparative analysis --

18         THE COURT:  Is that everything that is contained

19    in this?

20         MS. PAUL:  Yes.

21         THE COURT:  This includes Exhibit C, D 1 through

22    D 5, M, and O.  You want this binder to be under seal?

23         MS. PAUL:  In addition, the papers in opposition

24    and in support of their cross-motion include as their

25    Exhibit D to the Timmerman affidavit a duplicate of one of

eo                                                             6

1   our exhibits consisting of the manuscript in question.  It

2   is our position that as these --

3            THE COURT:  Do I have that?

4            MR. FOWLER:  You should have a copy of this

5   bound volume.

6            THE COURT:  I haven't seen anything bulky.  I

7   don't have that.

8            MS. PAUL:  It is a duplicate, your Honor, of one

9   of our exhibits, I believe Exhibit M.

10           THE COURT:  These are the page proofs of the

11  Hamilton work?

12           MR. CALLAGY:  We would oppose the application.

13           MS. PAUL:  I am not finished.  I was going to

14  state for the record that the ultimate issue in this

15  litigation with respect to unpublished works and with

16  respect to the book is whether or not they should be

17  published.  Therefore, we are requesting that the matters

18  be under seal so that they will not be publicly available

19  for quotation in the courthouse files.

20           I submit that making them publicly available and

21  not filing them under seal is tantamount to the ultimate

22  question posed in this litigation and we believe that it is

23  therefore both a necessary and relatively routine request

24  and respectfully urge the court to allow us to file them

25  under seal.

1          THE COURT:  Your concern is they may become

2   public property simply by virtue of being filed in the

3   public files of the court, where anyone would have access

4   to them and might take the liberty of quoting from them?

5          THE COURT:  You used the words public property,

6   your Honor.  I am not concerned about a transfer of a

7   property interest or a copyright interest, although that is

8   a potential problem.  I am concerned about the right of

9   publication, which is the first publication, which is in

10  issue in this lawsuit, and that should some reporter go to

11  the court's files and quote the letters, then that in and

12  of itself will have destroyed Mr. Salinger's right of first

13  publication in the letters themselves.

14         It is for that reason, both with respect to his

15  property rights and with respect to his specific property

16  right of copyright and with respect to his right of first

17  publication, which includes the right not to publish, we

18  are seeking to file these materials under seal.

19         THE COURT:  Mr. Callagy.

20         MR. CALLAGY:  The sealing application has

21  specific bearing on the application for a TRO.  Some months

22  ago the galleys --

23         THE COURT:  Say that again.

24         MR. CALLAGY:  It has specific application to

25  their request for injunctive relief.  Some months ago the

eo

8

1    initial galley for the work was distributed nationwide and

2    there are many, many copies that are out there.

3         In addition, the letters -- by the way, we have

4    not seen the exhibit folder that is before your Honor,

5    which plaintiff's counsel has given you.

6         THE COURT:  You haven't received it?

7         MS. PAUL:  Your Honor, Mr. Callagy refused to

8    agree to not release it were I to give him copies of those

9    exhibits which are under seal.  There are four exhibits

10   which are under seal.  Three of them are materials which he

11   already has copies of, two versions of the manuscript of

12   the book and the letters themselves.

13        It is the fourth exhibit in the bound volume in

14   your hand, which are examples of our comparative analysis

15   of the work, which we believe is important here, which Mr.

16   Callagy has not seen because he would not agree to be bound

17   by strictures of strict confidentiality with respect to

18   these exhibits.

19        MR. CALLAGY:  They asked if I would agree to

20   treat these documents as under seal and I explained that

21   the letters, for example, are all public documents.  They

22   are in various libraries throughout the U.S.  The public

23   has had access to them for many, many years.

24        Based on plaintiff's papers, it turns out that

25   Mr. Salinger was unaware of their existence, and certainly

1    he was unaware that various recipients of the letters had

2    given them to the libraries.

3           But to try to transform these letters to a

4    status that they didn't have for many, many years --

5           THE COURT:  This is talking about an exhibit

6    filed with the court.

7           MR. CALLAGY:  I understand.

8           THE COURT:  The status that the letters have in

9    the libraries where they sit is not going to be affected by

10   whether I direct that the exhibits filed with the court be

11   under seal.

12          I think the plaintiff's concern is the status

13   not be affected by their being filed with the court and I

14   don't see how my placing them under seal can affect the

15   status of the letters as they sit in the libraries.

16          MR. CALLAGY:  I agree with you.  But on the

17   other hand, I don't think their concern about public domain

18   or loss of copyright protection, if there is any protection,

19   is affected.  When they asked me last night if I would

20   agree to this they extended the prohibition to even telling

21   or showing the letters to my client or the comparison they

22   prepared, and I don't agree to that.

23          MS. PAUL:  Mr. Callagy, both versions of the

24   manuscript obviously you have in your possession and the

25   letters I know you have in your possession.

1              MR. CALLAGY:  We gave them to you in many cases.

2              MS. PAUL:  Yes.  My position quite simply is

3    that nothing that this court does, as your Honor indicated,

4    is going to affect the status, their status in the

5    libraries, but it is misleading to say they are publicly

6    available in the libraries, because one of the issues here --

7              THE COURT:  Nothing that this court does, the

8    decisions that I render conceivably might, but sealing the

9    exhibit or not sealing the exhibit shouldn't.

10             MS. PAUL:  Moreover, in the libraries they are

11   subject to strict regulations and requirements in order to

12   have access to them in the libraries which we allege Mr.

13   Hamilton specifically breached here.

14             THE COURT:  I don't have any view having just in

15   the last few minutes become familiar with the subject

16   matter of the lawsuit, I don't have any view right now as

17   to what the legal status is of the letters in the libraries.

18   I have read your accounts of them and your arguments on the

19   subject.  I have heard a little bit orally, but it strikes

20   me, since what the plaintiff is seeking is to enforce what

21   the plaintiff claims are copyright interests to protect a

22   right that the plaintiff claims he has of first publication,

23   as well as a third party beneficiary contract right to

24   prevent the publication of the letters, it seems to me

25   appropriate without having reached much of a decision, any

eo                                                                  11

1    decision on the extent of plaintiff's rights that I direct

2    that the exhibits be sealed since not directing that they

3    be sealed could very substantially affect those rights in a

4    manner harmful to the plaintiff, but sealing them cannot

5    possibly in any way harm the defendant.

6              Isn't that the case?  Is there any way you can

7    be injured by my directing that these court exhibits be

8    sealed?

9              MR. CALLAGY:  The one thing I don't want is for

10   someone to say well, the court granted a quasi injunction

11   with respect to those letters.

12             THE COURT:  You can't prevent people from saying

13   things.

14             MR. CALLAGY:  I must also add that when we

15   supplied -- when plaintiff realized that these letters

16   existed, his counsel asked for copies of them and we in

17   good faith supplied them and they proceeded to file them in

18   Washington with the copyright office so they are available

19   there for the public to see as well.

20             THE COURT:  They can go see them there, then,

21   but not in the court file.  I just don't see that this is

22   really worth spending a lot of time talking about.  I don't

23   see how the defendant can conceivably be injured by my

24   directing that these exhibits be sealed.  I do see how the

25   plaintiff could seriously be injured if the plaintiff is

1    correct in his assertion of rights by making them publicly

2    available for copying and publication through the court

3    files.

4              So I will grant the application to seal this

5    file.

6              I will direct that the exhibits that are under

7    that order are not to be used by counsel or the parties in

8    any manner except in litigation of the lawsuit.

9              MS. PAUL:  Thank you, your Honor.

10              MR. CALLAGY:  Could we receive a copy of them

11    and then could we show them to our client?

12              THE COURT:  With the understanding that your

13    client is subject to the court's order, which would bar the

14    client from publishing the material received from the

15    plaintiff or using it otherwise than in the litigation of

16    the lawsuit.

17              MR. CALLAGY:  We are only talking about the

18    comparison.

19              THE COURT:  The rest you have already.

20              MR. CALLAGY:  Because the rest is material we

21    gave them.

22              THE COURT:  That is right.

23              MS. PAUL:  In terms of what his client and

24    attorneys are permitted to do, however, with respect to --

25    let me back up and say that, yes, they have the other

eo

13

1    exhibits.  At issue in this lawsuit is the issue of whether

2    they may publish the other exhibits.

3              THE COURT:  Right.

4              Now we are just talking about whether these

5    documents contained in this folder, in this binder --

6              MS. PAUL:  And Exhibit D.

7              THE COURT:  Are to be under seal.  And this

8    exhibit also?

9              MS. PAUL:  Exhibit D to the Timberman affidavit,

10   which is a duplicate of our Exhibit M to the Salinger

11   affidavit.

12             MR. CALLAGY:  What you have in your hand, Judge,

13   is what will be distributed on Monday morning to reviewers.

14   That is the printed galley.

15             THE COURT:  Yes.

16             MS. PAUL:  If I may go back to the substance

17   having raised the initial threshold issue, your Honor.

18             I would like to begin with what I think are the

19   easiest issues.  Despite the substantial pile of paper that

20   you have in front of you, I think that we can narrow the

21   issue in dispute down very simply.  I begin with

22   irreparable injury.

23             Defendants have stated -- Mr. Callagy has now

24   stated on this record that they intend to ship review

25   copies of this book in this form on Monday morning.

1    They have also advised us that they plan to ship

2    the book itself shortly thereafter.

3    If, as we allege and I believe we will convince

4    the court plaintiff has the right of first publication,

5    that, right of first publication has been infringed by the

6    defendants in this manuscript and this book, then shipping

7    of review copies will clearly cause irreparable injury.

8    The right of first publication is unique because

9    it can only be exploited once.  In any copyright case there

10    is a presumption which aids the plaintiff in obtaining the

11    preliminary injunction.  In this particular case, given the

12    unpublished nature of the letters in issue, there is a

13    particular and compelling need for injunctive relief.

14    Once the work is out in the public domain there

15    can no longer be a first publication.  Indeed, since the

16    right of first publication includes the right not to

17    publish at all, which is our client's intention, that right

18    not to publish at all would be completely destroyed by

19    publication.

20    I then move to the question or to the defense on

21    which the defendants bear the burden of proof of fair use.

22    I with like to very briefly summarize the facts of what

23    happened here.

24    Ian Hamilton, the author of this book, wrote a

25    letter to J. D. Salinger, who is a well-known author,

eo

15

1    published Franny and Zooey, Raise High the Roof Beam

2    Carpenters and other books up until 1965.  It has now been

3    20 years since he has published anything and he shuns all

4    publicity.  He lives up in Vermont.

5          He received a letter from Ian Hamilton, the

6    author, saying Mr. Hamilton wanted to write a biography of

7    him and asked for his cooperation.  Mr. Salinger declined

8    to cooperate and said he didn't like unauthorized

9    biographies.

10          Mr. Hamilton set about, nonetheless, writing

11   this book. One of the things that he did in order to gather

12   material for this book was to visit various libraries which

13   housed letters that Mr. Salinger had written to, among

14   others, Judge Learned Hand and his wife and Whit Burnett

15   and his publishers.

16          His letters were in the libraries under

17   restrictions with regard to access to the works.  Mr.

18   Hamilton signed agreements at the libraries agreeing to be

19   bound by the rules and regulations and those rules and

20   regulations are annexed to Mr. Salinger's affidavit.  He

21   violated those agreements in some cases.

22          THE COURT:  Where is the Hamilton affidavit?

23          MS. PAUL:  E, F and G.

24          (Pause)

25          THE COURT:  Yes.

eo

1          MS. PAUL:  Under those agreements Mr. Hamilton

2     well knew that Mr. Salinger was the copyright owner of

3     those letters.  The distinction that was referred to as the

4     strange dichotomy with respect to letters of rights between

5     the recipients of the letter, who owns the physical

6     property of the letter, and the author of the letter, who

7     retains any copyright interest in writing of the letter.

8          Mr. Hamilton knew that he could not use those

9     letters without obtaining permission from the library in

10    question and --

11         THE COURT:  Let me just stop you there.  Is that

12    disputed?  Is it disputed that the author of the letter

13    owned a copyright interest?

14         MR. CALLAGY:  That is not disputed, but what is

15    disputed is the fact and it is our position that none of

16    the letters were quoted which are subject to this agreement.

17         THE COURT:  I was just asking about that point.

18    You don't dispute that the author of the letters owned the

19    copyright?

20         MR. CALLAGY:  As a general proposition we don't

21    dispute that.

22         THE COURT:  Nor does the plaintiff dispute that

23    the doctrine of fair use applies to this controversy.  You

24    differ as to whether this is fair use, but the defendant

25    spends a large portion of the brief arguing that fair use

eo

17

1   is an applicable doctrine to this controversy.  You don't

2   dispute that, do you?

3        MS. PAUL:  We do to a certain extent.  We

4   believe that when dealing with the right of first

5   publication with unpublished letters under the authority of

6   the Nation case, that the fair use doctrine has little, if

7   any, relevance.

8        Nonetheless, just as the Supreme Court in the

9   Nation case did a fair use analysis in spite of its

10   statements with regard to the right of first publication,

11   we also have done a fair use analysis and believe that

12   under that analysis this is not a fair use.

13        THE COURT:  All right.  Go ahead.

14        MS. PAUL:  Mr. Hamilton and Random House

15   produced the manuscript.  That was, I believe, in May of

16   this year, late May.  That manuscript contained extensive

17   quotations, verbatim quotations, from 70 of Mr. Salinger's

18   unpublished letters. These letters were his own private

19   expression to friends of his of his opinions, fantasies,

20   philosophies.

21        Mr. Salinger obtained a copy of the manuscript.

22   That manuscript was disseminated so far as we know before

23   Mr. Salinger learned of it.  Review copies were circulated

24   and some copies were circulated to potential licensees of

25   Random House of Mr. Hamilton's rights.

eo                                                                    18

1          Our complaint pleads that that dissemination was

2     an infringement in and of itself.  Mr. Salinger acting

3     through us as his attorneys --

4          THE COURT:  What do you mean by potential

5     licensees?

6          MS. PAUL:  The New York Times magazine had first

7     serial rights.

8          THE COURT:  Paperback rights, movie rights, that

9     kind of thing?

10          MS. PAUL:  Yes.

11          THE COURT:  They were supposed to publish it in

12     serial form?

13          MS. PAUL:  The New York Times magazine has, I

14     believe, prepublication for first serial rights.  The book

15     is supposed to be simultaneously published by William

16     Heineman in England and there were some serial rights, I

17     believe, that the London Observer had.

18          Random House pulled the manuscript or the book.

19     We say they were caught redhanded and they recognized what

20     happened.  They say they were just trying to accomodate Mr.

21     Salinger.

22          We reached an agreement with them that we would

23     have ten days notice, ten days to see their revised page

24     proofs prior to the time that they would disseminate in any

25     form a revised manuscript, if they came up with one.  It

eo

1  was not clear to us at that point that we would or indeed

2  that they could because the entire guts of the manuscript

3  were the letters.

4        THE COURT:  Incidentally, is part of the relief

5  that you are seeking now an injunction with respect to the

6  prior version of the manuscript?

7        MS. PAUL:  Both versions are an infringement and,

8  therefore, we would want an injunction against the book

9  both in its current form, which is referred to in our

10  papers as the revised page proofs, and in its earlier form,

11  which is referred to in our papers as the May galleys.

12        THE COURT:  May galleys?

13        MS. PAUL:  Yes.

14        THE COURT:  Go ahead.

15        MS. PAUL:  We received -- before we received --

16        THE COURT:  You say that at least as far as the

17  lawsuit is concerned the major change as between the May

18  galleys and the current page proofs is that where the May

19  galleys contained much more extensive quotation from the

20  letters, the current page proofs have converted those

21  quotations in large part into what you call paraphrases and

22  what the defendant calls fair comment?

23        MS. PAUL:  They call various things in various

24  places, which I would like to get to, but yes, your Honor,

25  that is a general statement that is accurate of the

1    respective conditions.

2           THE COURT:  You say, if I understand correctly,

3    from your papers that in the current page proofs only 200

4    words of actual quotation survive?

5           MS. PAUL:  217 words, but I should say something

6    about why there is a discrepancy between plaintiff's papers

7    and defendant's papers on that point.  There are different --

8           THE COURT:  The other thing I wanted to ask is

9    what was the extent of the quotation?

10          MS. PAUL:  More so than in the Nation.

11          THE COURT:  In the May galleys, what was the

12    extent of quotation before the controversy arose and the

13    alterations were made?

14          MS. PAUL:  Certainly much more extensive.  I am

15    trying to get an answer for you.  I don't have a number

16    count.

17          MR. BOOSE:  We don't know.

18          MS. PAUL:  But, your Honor, the 217 words is

19    more so than in the Nation case, but I am still trying to

20    summarize or encapsulate the facts here.

21          Prior to the time we received the revised page

22    proofs we learned that Random House or Hamilton had

23    belatedly attempted to obtain permission at least from the

24    libraries.  They obviously couldn't from Mr. Salinger

25    because they knew his position.

eo

1    I think your Honor would find interesting a

2  letter from the University of Texas library, which is

3  annexed to our papers as Exhibit L in the nonsealed

4  documents, which clearly reflects the library's position

5  with regard to what Mr. Hamilton had done.

6    THE COURT:  Yes.

7    MS. PAUL:  In so far as we know, neither Mr.

8  Hamilton or Random House obtained permission from any of

9  the libraries.  They certainly do not have permission from

10  Mr. Salinger.

11    We then received revised page proofs on the

12  understanding we would have ten days, which was extended

13  one week, to reach judgment with respect to them and we

14  agreed to give the defendant's counsel, who was identified

15  at that point and participating in the process, 48 hours

16  notice of our intention to come into court. We have done so.

17    The May galleys --

18    THE COURT:  When did you receive the current

19  version?

20    MS. PAUL:  A week ago --

21    MR. BOOSE:  Ten days before last Monday.

22    MS. PAUL:  Ten days before last Monday.

23    THE COURT:  Is it correct to say that more than

24  two weeks ago you did not know or did not have before you

25  any reasonably reliable indication of what the new version

eo

1    was going to look like?

2          MS. PAUL:  We didn't even know there would be a

3    new version.  It was our feeling, although we thought that

4    perhaps Random House would try to do something here, that

5    these letters were so central and so much the guts and the

6    heart, to use the word from the Nation case, of the book

7    that they couldn't really come up with a viable manuscript

8    without using the letters.

9          THE COURT:  You hadn't seen what you describe as

10   the paraphrasing until two weeks ago?

11         MS. PAUL:  Correct.

12         THE COURT:  Okay.

13         MS. PAUL:  After we received it, there was a

14   meeting at which point we were unable to resolve the

15   matters in dispute and we gave defendant's counsel and

16   defendants notice of our intention to proceed today and at

17   this time.

18         I said that the issues really boil down to

19   something very simple.  The way I see that is that I

20   believe that the Nation case is absolutely dispositive here

21   on the issue of fair use, if fair use applies, and even

22   assuming that fair use applies under the Supreme Court's

23   formulation in the Nation case. The Supreme Court said in

24   no uncertain terms that when dealing with the right of

25   first publication it has never been seriously disputed that

1    the fact that plaintiff's work is unpublished is a factor
2    tending to negate the defense of fair use.

3            Publication of an author's expression before he
4    has authorized its dissemination seriously infringes the
5    author's right to decide when and whether it will be made
6    public, a factor not present in various published works.

7            THE COURT:  Let me ask you a question about that
8    point.  Is there a difference between the applicability of
9    fair use to the right of first publication where the
10   intention of the owner of the right is to make that first
11   publication two weeks later or one week later or whatever
12   the facts were in the Nation case as distinguished from the
13   circumstances here where the owner of the right, if you are
14   correct in that contention, intends never to have them
15   published during his lifetime?

16           In other words, one might be described as gun
17   jumping.  The other could be described with somewhat loaded
18   words as an effort on the part of the owner of the right of
19   first publication to prevent that publication.  In other
20   words, to deny the public whatever the public might receive
21   from the publication.

22           In other words, I wonder whether the Supreme
23   Court's Nation case would have discussed that matter in
24   quite the same terms if President Ford had been saying, no
25   one will ever see these papers until my ashes have turned

eo

1    to dust, as opposed to the situation where he was arranging

2    to have them published very shortly after the publication

3    by the gun jumper.

4         MS. PAUL:  Your Honor, I believe, assuming you

5    want to assume this, that the right of first publication

6    includes the right not to publish, that that is what the

7    copyright laws are designed to protect, both the right to

8    publish and the right not to publish.

9         We are talking about --

10         THE COURT:  I just wonder whether they are

11    coextensive?

12         MS. PAUL:  I believe that under the Supreme

13    Court's analysis in the Nation case that the Supreme Court

14    spent a lot of time dealing with the issue that was raised

15    by the Nation that in the context of the scheduled

16    publication that this really wasn't going to be the same

17    type of injury as it would be had the Supreme Court not

18    intended -- had President Ford not intended to publish.

19         In other words, the Supreme Court said that in a

20    situation where an author determines not to publish, the

21    right is entitled to even greater protection than it is in

22    a situation where there is a scheduled publication date.

23         I would call your Honor's attention to the

24    comparative schedule on page 23 of our brief of the facts

25    in the Nation case vis-a-vis the facts in this case.

eo

25

1      THE COURT:  I noticed when I read your brief

2   that you argued that point.  Yes.

3      MS. PAUL:  It seems to me that comparing these

4   facts and particularly the fact that your Honor just made

5   reference to that the memoirs, when published, were

6   schedule to be published imminently demonstrates that this

7   is a lot stronger case than the Nation case.

8      Also on page 27 there is a quotation of the

9   language in the Nation case to the effect that certainly

10   letters and confidential writings not intended for

11   dissemination are protected.

12      What they are doing here is explaining away the

13   argument made by the Nation that because President Ford's

14   memoirs were intended for dissemination they should be

15   entitled to some lesser protection and so a fortiori if the

16   Supreme Court was saying, we are going to protect this work

17   even in the context when it is intended for dessimination,

18   the right not to publish should be entitled to greater

19   protection.

20      Going back to the Nation analysis --

21      THE COURT:  I guess maybe part of the point is

22   that if the doctrine of fair use has some role here, that

23   maybe the appropriate scope of the fair use doctrine is

24   different as between a gun-jumper, who would but for the

25   court decision succeed in beating the lawfully authorized

1   copyright holder and licensee to publication as compared

2   with the fair use right that might be enjoyed by one who is

3   seeking to tell the public about information that the

4   public won't ever receive for 40 years into the future.

5          MS. PAUL: Your Honor, that is the point. You

6   used the word "information." That is what I think the real

7   issue in this case is. That is why this case is different,

8   although the same result appears as in the Nation case.

9          There we are talking about President Ford's

10  decision to pardon President Nixon. Here we're talking

11  about Salinger's expressions of his philosophies, fantasies,

12  criticisms and ideas.

13         Our position is that on the basis of the Nation

14  case, and particularly in comparison with the facts in the

15  Nation case, there is no fair use here. So what issue

16  remains?

17         THE COURT: I understand that will be a major

18  issue in this case, but by the same token a J. D. Salinger,

19  like it or not, is a public figure of note, a very famous

20  author revered and idolized by a generation, and he's not

21  just somebody who sat in a closet and exercised the right

22  of copyright. He is a very famous man, a very famous

23  public figure. So he is not totally different from

24  President Ford. He is an author.

25         MS. PAUL: Your Honor, President Ford was

eo

1    writing about historical events.  Mr. Salinger was writing

2    to his friends about his personal philosophies.  I think --

3              THE COURT:   My point is that Salinger's

4    personal philosophies are a subject of widespread public

5    interest.  If somebody wrote a book, I don't think you

6    would contend that there would be no legal right to write

7    such a book entitled, what was the word you used, his

8    personal philosophies?

9              MS. PAUL:  Criticisms, fantasies.

10             THE COURT:  The personal philosophies of J. D.

11   Salinger and without copying or paraphrasing any

12   copyrighted work of Salinger and they wrote a book on that

13   subject, if the book was any good it would probably sell a

14   lot of copies.

15             MS. PAUL:  We don't dispute that, your Honor.

16   What this lawsuit is not is an invasion of privacy suit.

17   It is not a defamation suit.

18             THE COURT:  My only point was he is a subject of

19   public interest.

20             MS. PAUL:  He is a subject of public interest,

21   but any subject of public interest, including the extreme

22   example of President Ford in the Nation case, still has

23   copyright rights.  So what we are really dealing with here

24   is have they or have they not taken copyrightable

25   expression.

eo

1      THE COURT: You say really it comes down to a

2  very careful analysis of placing side by side the Salinger

3  letters and what you call the paraphrases of the Salinger

4  letters and deciding whether what the defendants have done

5  is an impermissible taking of the manner of expression,

6  over which Salinger owns the copyright, as opposed to fair

7  comment on information or whatever to be gleaned from the

8  letters.

9      MS. PAUL:  Your Honor, that is exactly the

10  critical issue in the litigation.  I would also add that we

11  do claim that the verbatim quotations which were made in

12  the manuscript under the authority of the Nation in and of

13  themselves would be sufficient, but your Honor is right on

14  point and our Exhibit O is exactly that.

15      THE COURT:  Is your contract claim a broader

16  claim?  Are you claiming that even if you fail to prevail

17  on a copyright claim, are you claiming that even as to

18  matter that the defendant might convince the court was fair

19  comment, it was nonetheless done in violation of Hamilton's

20  contract with the libraries of which Salinger was a third

21  party beneficiary varies.

22      MS. PAUL:  Yes, your Honor.

23      THE COURT:  You are saying that that claim is

24  broader.  Even if it is fair comment, even if it is not

25  violation of copyright law, he didn't have the right to

eo

1   even use fair comment without having received permission

2   since he entered into a contract with those libraries?

3           MS. PAUL:  It varies with the library and

4   therefore it varies with which letters were housed at which

5   libraries.  I would submit that as an equitable matter --

6           THE COURT:  The library agreements differed from

7   one library to the other?

8           MS. PAUL:  Yes.  Firestone, Harvard Law and

9   University of Texas and also there was one set of the

10  letters in question that were with the publisher, which is

11  not a library, and there was no agreement in England.

12          Exhibit O is, we submit, the guts of what this

13  case is about at this point.  What has been taken here is

14  without question expression.  Mr. Hamilton would like this

15  court to believe that what he took is fact.  That what he

16  took and how he did it is reporting.  The last thing in

17  that binder is Exhibit O.

18          THE COURT:  Yes.

19          What is Exhibit D?

20          MS. PAUL:  Those are the letters themselves.

21  The certificates are also annexed to the complaint.  In

22  that binder the certificates are together with the letters

23  for purposes of clarity and we don't claim that the

24  certificates themselves are confidential.

25          THE COURT:  This Exhibit D, is that all the

eo                                                                    30

1   letters or is that all the letters that the defendant has

2   referred to?

3          MS. PAUL:  All the letters that have been

4   infringed.

5          THE COURT:  Your Exhibit O -- is Exhibit O

6   merely a number of examples of comparison?

7          MS. PAUL:  Yes.

8          THE COURT:  It is not exhaustive?

9          MS. PAUL:  It is not exhaustive by any means.

10         Your Honor, there is also one other background --

11         THE COURT:  One of the things that I will

12  undoubtedly want from you, so you might as well get busy on

13  it earlier rather than later, is an exhaustive Exhibit O

14  type list of every instance that you claim to be an

15  infringement.

16         MS. PAUL:  Since we claim it is the entire book,

17  we will certainly do it, but it is going to be long.  We

18  can do it and we will.

19         THE COURT:  I haven't read the book, obviously,

20  but you claim it was the entire book --

21         MS. PAUL:  That is hyperbole.  Everything except

22  the introduction and two other chapters is largely, I say

23  largely because of the Supreme Court, their papers concede

24  in effect that these letters, the book couldn't be without

25  the letters.  That they are the heart of the book in the

eo

1    words of the Supreme Court of the Nation case.

2           THE COURT:  Maybe the book couldn't be without a

3    reference to the letters and without comment on the letters,

4    but are you saying that there is no way that Hamilton can

5    write about those letters --

6           MS. PAUL:  Certainly not, your Honor.

7           THE COURT:  -- without violating the copyright?

8    You might say there is no way he can do it without

9    violating the library agreements.

10          MS. PAUL:  That may be.

11          THE COURT:  Surely he can say things about

12   Salinger drawn from the letters without violating the

13   copyright?

14          MS. PAUL:  He can say Mr. Salinger wrote a

15   letter to so and so, who was a friend of his, on such and

16   such a date on the subject of X.

17          THE COURT:  He can say he was furious about

18   something.

19          MS. PAUL:  Yes, your Honor.  However, that is

20   not what they have done here.  What they have done here is

21   taken his expression.

22          THE COURT:  Okay.

23          MS. PAUL:  I think that the way to highlight

24   that issue is to look at paragraph 8 of Mr. Hamilton's

25   affidavit which says --

1          THE COURT:  Paragraph 8.

2          MS. PAUL:  Just going down that paragraph:

3          As I have mentioned, I regard these letters as a

4   tremendous autobiographical resource, conceding the

5   importance of the letters.

6          "Autobiographical," yes, Mr. Boose just pointed

7   out.  I am not quite sure what that means in that context,

8   but it certainly seems telling to me.

9          Any biography of Mr. Salinger would be

10  incomplete if it failed to make reference to the facts set

11  forth in these documents.

12         They did not take the facts set forth in these

13  documents.  They took his expression of those facts.

14         Many if not most of these facts are not

15  contained in any other source.  That demonstrates the

16  importance of what he calls facts and we say are

17  protectable, copyrightable expression.

18         He thinks it would be totally inconsistent with

19  the craft of biography to omit such materials.

20         He therefore attempted to the best of his

21  ability to record the factual material contained in these

22  letters as accurately as he could, recognizing my

23  obligation under the copyright laws to express these facts

24  in my own words. I will not pretend that this was an easy

25  task.  Then he goes on and says:

eo                                                                              33

 1              What I attempted to do in my reports of these

 2      letters was to give a true account of events without

 3      impinging upon Mr. Salinger's word choice and expressive

 4      devices.

 5              Now, I submit that you cannot look at Exhibit O

 6      and believe -- well, I am willing to concede, because I

 7      have never met Mr. Hamilton, that that may be what he

 8      attempted to do, but it certainly isn't what he did.  It

 9      certainly isn't what that manuscript reflects and what it

10      says.

11              THE COURT:  In any event, in writing paragraph 8

12      of his affidavit Mr. Hamilton exhibits a good understanding

13      of the copyright law.

14              MS. PAUL:  Belatedly, since he seems to feel

15      that his visits to the library in the first go around in

16      terms of the May galleys --

17              THE COURT:  Let me hear from the defendant.

18              MR. CALLAGY:  Initially on the cross-assertion,

19      there is not one quote of any letter that was subject to

20      any of the so-called library agreements.  As far as the

21      quotes are concerned, less than one tenth of 1 percent of

22      the portions of the letters that Ian Hamilton referred to

23      appear as quotes in the work.  That is referred to in his

24      affidavit.

25              As Ms. Paul said, it was approximately 217 words.

eo

1    We would agree with that word count and it is our

2    understanding that these words come from 82 different

3    separate sources and they average approximately 3.7 words

4    per source.

5        Judge, let me give you a little background here.

6    The author Hamilton, and you referred to him when we

7    started, has written a very serious, scholarly biography of

8    the literary life of J. D. Salinger.  He started his work

9    about three years ago.  At great personal expense he

10   researched and wrote the book himself.  He traveled

11   extensively.  I believe he contacted some 50 to 60 people --

12       THE COURT:  Let me just interrupt you and go

13   back to the first thing you said.  You said that no quote

14   is from any letter that was subject to any of the library

15   agreements?

16       MR. CALLAGY:  That is correct.

17       THE COURT:  The quotes come from other letters

18   that he didn't get from the library?

19       MR. CALLAGY:  That is correct.  For example, my

20   adversary didn't mention this but in 1984 a biography of

21   Salinger was published by a man named Sublette and I

22   believe this is an exhibit, but Mr. Sublette relied on --

23       THE COURT:  That is referred to as a

24   bibliography.

25       MS. PAUL:  That is correct, your Honor.

eo

1          THE COURT:  A bibliography.

2          MR. HOLLINGSWORTH:  Autobiographical.

3          MR. CALLAGY:  This was published in hardcover in

4    1984 and this work refers to certain of the letters that

5    Ian Hamilton has also referred to, but it quotes far more

6    extensively than the 200 odd words that Ian Hamilton has

7    quoted in the work that is to be published by Random House.

8          THE COURT:  Those quotes are in this book?

9          MR. CALLAGY:  Sure.  You can see, if you just

10   flip through this, he's got direct quotes and extensive

11   direct quotes from various of the letters.  Again when they

12   come to court today, Mr. Salinger says, well, he was

13   unaware of this work, too, just as he was unaware of the

14   letters. This work has been in hardcover and it has been

15   out in the market for the past two years.

16          Going back to the inception of the project, Ian

17   Hamilton tried to uncover everything he could about

18   Salinger.  He went to Salinger's schools.  He went to

19   Valley Forge.  He talked to people.  He located letters in

20   libraries around the country and he went there and he

21   researched those letters and he read all of Salinger's

22   works.

23          Before he started he wrote to Salinger and he

24   asked Salinger for his help.  He asked Salinger for an

25   interview and Salinger said no. He not only didn't like

1   biographies, but he certainly didn't want a biography about

2   himself.

3               Salinger didn't stop there.  In 1983 he wrote to

4   Random House and he said, I object to any biography and I

5   urge you to shelve it.

6               In response to that letter from Salinger, Random

7   House wrote back to Salinger and said, and I think this is

8   Exhibit C to our cross-motion, this is a letter that Jason

9   Epstein wrote to J. D. Salinger in August of 1983, and he

10  said -- you can see it is the last exhibit there -- if I

11  had said to Hamilton, no, Salinger was out of bounds, what

12  would I have said to Plutarch, if I had been his publisher,

13  or for that matter to Osario Boswell, and then he raises

14  the rhetorical question, do you see my problem?

15              When Salinger originally raised objection to the

16  biography, he started off initially talking about

17  defamation, invasion of privacy and today when we were

18  served with the complaint we see that it has Lanham Act

19  claims, breach of contract and, of course, this application

20  for injunctive relief is grounded on copyright infringement.

21              The bottom line, as we see it, goes back for

22  three years is that Salinger just doesn't want a biography

23  written about himself.

24              When Hamilton located --

25              THE COURT:  I don't see that is terribly

1   pertinent.  The fact that he doesn't want a biography

2   written about himself doesn't help the plaintiff.  He has

3   no right to prevent it, but I don't see that it helps the

4   defendant either.  The fact that he doesn't want a

5   biography written about himself doesn't mean the defendant

6   has a right to violate his copyright.

7        MR. CALLAGY:  What is really behind this case is

8   an attempt to use the copyright law to achieve another

9   purpose.

10       THE COURT:  Even if that were true what

11  difference would it make?  Supposing that he had confided

12  to a friend and you could prove and he wouldn't even deny

13  that he is only asserting his copyright interest because he

14  doesn't want this biography written, nonetheless, if it is

15  his copyright interest, he's got the right to do it.

16       MR. CALLAGY:  I would agree, but that takes us

17  to what is the interest he is asserting.  He claims now

18  that he didn't know about these letters.  By the way, he

19  gave none of these letters to any libraries.  All of these

20  letters were given to friends.  Friends may have given them

21  to the libraries --

22       THE COURT:  By given to friends, do you mean he

23  made a gift of the letters to the friend or that they were

24  letters that he wrote to them?

25       MR. CALLAGY:  Letters he wrote to friends and

eo

1   friends either turned them over to the libraries or in any

2   event they came into the possession of the author Hamilton.

3          As I said, he has used one-tenth of 1 percent of

4   the quotes.  It is our position that the letters themselves --

5          THE COURT:  I don't understand.  One tenth of 1

6   percent of what?

7          MR. CALLAGY:  Of the letters or the portions of

8   the letters that Hamilton relied on, he's only quoted one

9   tenth of 1 percent of them or eight-tenths of 1 percent.

10         THE COURT:  You are saying the total volume of

11  the letters referred to by Hamilton, eight-tenths of 1

12  percent of that is quoted?

13         MR. CALLAGY:  Is quoted.

14         THE COURT:  All right.

15         MR. CALLAGY:  The universe of the letters is

16  much larger than what Hamilton referred to because there

17  are other letters that he didn't even refer to.  These are

18  letters that he is aware of that he didn't refer to, so the

19  percentage comes way down.

20         My adversary talked about the Nation case.  It

21  is very clear to me that the Nation case involved a

22  clandestine attempt to scoop Time Magazine.  Time Magazine

23  had paid $25,000 for the rights to the Ford memoirs and the

24  Nation was aware of that and they scooped him.  They paid

25  nothing for it and they attempted to basically reap what

eo

1    they hadn't sown.

2              I think a more important case, which is somewhat

3    similar in terms of the facts, is the Merropol case.  They

4    are the children of Ethyl and Julius Rosenberg.  Right

5    after their death they changed their names.  They moved to

6    Massachusetts and they sought anonymity.  20 years later,

7    when Nizer attempted to publish the Implosional Conspiracy,

8    Nizer drew in connection with this biography work on

9    unpublished letters that had appeared in England in

10   published form in a work entitled The Death House Letters.

11   There the number and quantity of letters that had been

12   taken and used by Nizer was much more substantial than the

13   diminimus amount that we are involved with here.

14             I think over 1,900 words had been used and,

15   unlike in the Nation case, the Merropols came in claiming

16   privacy but sought to enjoin the publication based on

17   copyright.

18             I think it was Judge Tyler in the reported

19   decision that denied the motion for injunctive relief on

20   the grounds that there was no likelihood of success on the

21   merits, no irreparable harm.

22             Ultimately the district court granted summary

23   judgment on the issue of fair use and in that case the case

24   came down because the Merropols later claimed that they

25   were going to bring out their own volume of letters and the

eo

40

1    Second Circuit asked that there be some further testimony

2    as to whether the value of the letters had in any way been

3    diminished by the Implosion Conspiracy publication and that

4    is when the case ended.

5            Here, your Honor, certainly under the Nation

6    case, fair use is very much alive.  There is a diminimus

7    use.  There is no basis for any injunctive relief.  What we

8    are involved with here is Ian Hamilton who took these

9    autobiographical facts and turned them into his own

10   expression.

11           They claim it is paraphrasing, but if your Honor

12   will look at what is involved, and you have the exibits

13   before you to make a determination, this is his own

14   expression and they can't stop it.

15           When my adversary said, well, he is entitled to

16   say that Salinger wrote a letter on a given date to a

17   recipient and the subject matter was X, they would have you

18   believe that that is all he can do.  But to the extent that

19   he, like any scholar or historian who has these letters

20   before him, he is free to read the letters and in his own

21   expression present what he sees in the letters.  He can

22   present his own ideas of philosophy.  He can talk about

23   Salinger's ideas.

24           THE COURT:   I don't think Ms. Paul disagrees

25   with that.

eo

1          MR. CALLAGY:  Much of what is in these letters

2    you will find are autobiography facts that found their way

3    into The Catcher in the Rye and Franny and Zooey.  Salinger

4    was famous for that, putting into his fictional accounts

5    real live instances, facts that had happened to him.  That

6    is really what Hamilton is doing here.

7          I don't see any basis for the claim that fair

8    use is inapplicable.  I think just based on the diminimus

9    content that we are dealing with as a matter of law fair

10   use should override any attempt to stay the publication of

11   this book.

12         As Ms. Paul said the book is scheduled to go to

13   reviewers on Monday morning.  Orders have been solicited

14   for the book.  Reviewers are prepared to write reviews on

15   it.  A great deal of money has been spent both by Random

16   House and by Ian Hamilton.  There is no irreparable harm to

17   this plaintiff.

18         Sublette, this work has been out for two years

19   and it contains far more in terms of quoting than what they

20   are claiming here.  The letters themselves have been

21   available for many years in many sources for use by

22   scholars such as Hamilton.

23         THE COURT:  I would like to hear from both of

24   you, and maybe you have already addressed it but I am not

25   sure I understand it, what do both sides contend is the

1    legal consequence of the fact that Sublette has published

2    whatever he published?

3                MS. PAUL:  We have papers on it.

4                THE COURT:  Let me come back to you after Mr.

5    Callagy has finished.

6                MR. CALLAGY:  To the extent that the author --

7                THE COURT:  Are you saying that because much of

8    this material or some of this material was earlier quoted

9    by Sublette in this published bibliography that it is now

10   in the public domain or that Salinger no longer enjoys the

11   copyright interest?

12               MR. CALLAGY:  I am saying for purposes of

13   irreparable harm that material has been out there for

14   people to use and Hamilton is free to quote from that work.

15               THE COURT:  You are saying it affects only the

16   irreparable harm issue.  Since the stuff has already been

17   published, he's not harmed by a republication of it.

18               MR. CALLAGY:  It also goes to fair use.  To the

19   extent that Salinger never made any claim against this

20   individual, this person quoted far more than is involved

21   here, and I think we are free to rely on that, and again

22   within the bounds and the scope of fair use to quote from

23   that.

24               THE COURT:  Aren't there two things to be said

25   there:  One is Salinger claims he didn't know about

1    Sublette and the second is, even if he had known about it,

2    there is a difference between a publication of a

3    bibliography.  90 percent of this volume consists of just

4    numbered entries with little paragraphs setting forth the

5    identification and a few lines of either description or

6    quotation.  It is not the kind of book people buy and read.

7    Maybe Salinger wouldn't be upset about Random House's

8    publication either if they were going to publish the book

9    and then print it up and put all the copies into a van and

10   dump it into the Atlantic Ocean.  Maybe he wouldn't mind

11   that either, since it wouldn't come to anybody's attention.

12        MR. CALLAGY:    I guess my argument was twofold.

13   One that that was out there.  Certainly there can be no

14   irreparable harm and, I agree, you are making a distinction

15   between this work and the definitive biography, which I

16   think ours is up to this point in time.

17        On the other hand, throughout that complaint you

18   will see that they are seeking damages.  The defendants are

19   good for damages here.  If he has been damaged, he's free

20   to pursue that.

21        Certainly I don't know of any cases which say

22   you can get an injunction against Random House based on

23   contract because we are not a party to that contract and,

24   as I said to your Honor, none of the letters that could

25   conceivably be subject to that contract have been quoted in

eo

44

1    the book.

2         We are here on the four elements to permit

3    injunctive relief:  Probable success on the merits, which I

4    say on the copyright issue they don't have based on fair

5    use.  Irreparable injury, I don't see that.  They have an

6    adequate remedy at law.  They pleaded it in their complaint.

7    In various of the causes of action they have asked for

8    damages.  Then, the balancing of the hardships tipping in

9    plaintiff's favor.

10         In this case it goes just the other way.  These

11   books are ready to go.  A lot of money has been spent on

12   the matter. Reviewers are ready, as you know, your honor,

13   if a book is killed it is hard to get it back on track.  We

14   feel very strongly not only for the reputation of Random

15   House in terms of what might happen if the injunction ever

16   issued, but in terms of all of the effort that went into

17   this.

18         I might say when they talk about the discussions

19   we have had, we did have discussions and we had those in

20   the interest not of any legal concern but really to try to

21   make Mr. Salinger feel better, but we were unsuccessful in

22   that regard. So, we tried to accommodate him.  For whatever

23   reason, he doesn't want this book published and I say, as I

24   said at the outset, that is really what this case is about.

25         MS. PAUL:  May I reply briefly?

1          THE COURT:   Yes.

2          MS. PAUL:   Throughout Mr. Callagy's presentation

3   he keeps talking about percentage of direct quotation,

4   whether the direct quotations in the book are in the

5   Sublette biography, whether there is any direct quotation

6   of letters subject to the library agreement.

7          They have submitted a 30 some odd page brief and

8   never once mentioned the word paraphrase.  Mr. Callagy I

9   noted said it once.  Mr. Hamilton doesn't use it at all in

10  his affidavit and I would like to know, if what they have

11  done in that book is not paraphrasing, what could be

12  paraphrasing?  If that is not paraphrasing, then what is it?

13  Because it is expression of ideas and what they did, you

14  can't just look at the second version of the book, you've

15  got to look at it from where they started.

16         They started with the letters and they started

17  with a version of the book that did direct quotation of the

18  letters.  They chiseled and chiseled and chiseled, but in

19  chiseling all they came up with was a paraphrase of

20  expression and paraphrase of expression is as much

21  protected under the copyright laws because one could under

22  their theory of the case take all of the letters and just

23  rewrite words here and there and use all of the letters.

24         It is so clearly a paraphrase, which is so

25  clearly protected, that it is no different than direct

eo

46

1    quotation.  Yes, we say we have significant direct

2    quotation here.  But all of Mr. Callagy's arguments are

3    limited to the direct quotation.  He says there is 8

4    percent of the portions of the letters quoted again.

5            MR. CALLAGY:  Eight-tenths of 1 percent.

6            MS. PAUL:  He is talking about what part is

7    quoted.  We also differ, by the way, even on that because

8    he is including something that I didn't mention which is

9    there are three forms of Mr. Salinger's works which are in

10   this book.

11           One is quotations from his published works.

12   This case does not concern the quotations from his

13   published works.

14           The second is quotations from three, I believe

15   it was, unpublished stories, which were housed at the

16   Princeton Firestone Library.

17           He has taken quotations from those stories.

18   This case does not --

19           THE COURT:  Quotations or paraphrasing?

20           MR. CALLAGY:  No, quotations.

21           MS. PAUL:  Just paraphrase.  This case does not

22   concern, we are not suing on those stories.  We are not

23   saying that this book, insofar as as it paraphrases those

24   stories, is an infringement.

25           THE COURT:  Why is that?  Why are you not

1    claiming that?

2              MS. PAUL:  Because we did not deem it to be a

3    sufficient taking.

4              THE COURT:  You say the paraphrase is either

5    sufficiently far from the original expression as not to be

6    violative or it is not a paraphrase at all?

7              MS. PAUL:  No, I am not saying that, your Honor.

8    I am saying that to the extent that they used portions of

9    those unpublished works which were in the Firestone Library,

10   the portions that they used and the manner in which they

11   used it, based on Mr. Salinger's analysis and the analysis

12   of his attorneys does not constitute a copyright

13   infringement.

14             THE COURT:  Because?

15             MR. BOOSE:  I think, first, because it is not

16   terribly substantial and, second, because he has no desire

17   to take the same position with regard to unpublished

18   stories as with regard to his private correspondence.

19             THE COURT:  You are saying to some extent it is

20   just his choice not to assert a claim that he may have with

21   respect to those unpublished stories?

22             MS. PAUL:  To a certain extent.

23             THE COURT:  All right.

24             MS. PAUL:  Your Honor, what I was saying was

25   that Mr. Callagy used percentages based on including the

1  unpublished stories, in addition to the letters, I believe.

2          THE COURT: You are saying that if the

3  percentage were drawn from the letters alone it would be

4  significantly higher?

5          MS. PAUL: Not significantly higher, but higher.

6  Again we are talking only about direct quotation. The

7  magic word "paraphrase" is completely absent even in that.

8          THE COURT: Like how high?

9          MS. PAUL: Direct quotation, 2 percent.

10          THE COURT: I really don't think that the

11  percentages are enormously helpful in a case of this nature.

12  I think these matters are not to be decided by accountants

13  based on percentages. They are somewhat helpful and they

14  are sometimes referred to in the court opinions but, as I

15  understand the plaintiff's position, you are saying that

16  more important than the percentage is a kind of qualitative

17  assessment. You say that the paraphrase by Hamilton is a

18  particularly important aspect of the expression of the

19  letter.

20          MS. PAUL: It is also a taking of the heart and

21  the guts of the letters. Yes, as the Supreme Court

22  indicated in the Nation case, the quantitative analysis

23  should give way to the qualitative analysis and there they

24  termed the Nixon pardon the heart of Ford's memoirs and we

25  say that the heart of each of the letters and the heart of

1    the letters as a whole has been taken.

2            I wanted to point out with respect to the

3    percentages that Mr. Callagy stated, A, they were addressed,

4    as I understand them, only to direct quotation and do not

5    include paraphrase and, B, they are calculated on a

6    different basis than we calculate because they include in

7    the body the unpublished works, which are not a subject of

8    this litigation.

9            With respect to the Merropol case, the Second

10    Circuit opinion -- first of all, I would like to point out

11    that Merropol concerned published letters.  This case

12    concerns unpublished letters.

13            Second of all-

14            MR. CALLAGY:  In the U.S. they have never been

15    published.  They have been published in England.

16            MS. PAUL:  Second of all, that the Second

17    Circuit opinion, which governs in that case, remands it for

18    a finding as to whether or not the taking was a fair use.

19    The case as I understand it -- he says the case ended after

20    that -- as I understand it the case settled after that so

21    the definitive opinion in the Merropol case to the extent

22    that the Merropol case governs here and I submit it is the

23    Nation case which is a Supreme Court decision issued 20

24    years after the Merropol case, I believe, that it is the

25    Nation case that governs, but even so the Second Circuit

eo

1    opinion in Merropol said you can't decide whether this is a

2    fair use or not on the basis of the record here and

3    remanded for a finding of fair use and then there is no

4    reported decision or other decision that I have been able

5    to find subsequent to that.

6              THE COURT:  Do both sides agree with the

7    proposition that what is set forth here in Exhibit O, the

8    comparison of quotes from the letters with quotes from the

9    Hamilton book, are the most important thing that is before

10   me to be decided?

11             MR. CALLAGY:  I haven't seen that.

12             THE COURT:  That puts you at a disadvantage.

13             Taking it --

14             MR. CALLAGY:  In response to counsel's point, it

15   is our position, and I think that If you just read the work

16   you will see that Hamilton did not simply take the words or

17   expression of Salinger in these letters.  What he did, they

18   are his own expression.  Hamilton expressed these himself,

19   so to the extent they talk paraphrase, we object to the use

20   of that term strenuously.

21             THE COURT:  I understand that you differ on the

22   appropriate word to describe what was done by Hamilton.

23             MR. CALLAGY:  We are pretty close on the word

24   count.

25             THE COURT:  Understanding that you haven't seen

1    Exhibit O do you agree with the proposition that the guts

2    of this lawsuit, the guts of this application for a TRO and

3    a preliminary injunction, and a finding in favor of the

4    plaintiff and your motion to dismiss lies in a precise

5    comparison of the actual text of the letters with the use

6    of those letters in Mr. Hamilton's words, whether it is

7    quotation, paraphrase, fair comment or mere comment on

8    facts contained in the letters, the guts of the lawsuit

9    lies in placing those two things side by side?

10           MR. CALLAGY:  The copyright claim relates to

11   that, but I don't think you have to get to that in terms

12   just based on what we have heard on the issue of injunction.

13           THE COURT:  Why is that?

14           MR. CALLAGY:  It just seems to me that the

15   presentation that counsel has made does not measure to the

16   level that irreparable would occur here.

17           THE COURT:  I don't understand.  You are saying

18   that even if there is a copyright infringement --

19           MR. CALLAGY:  I am not saying that.  I say even

20   if you accept their claim with respect to the numbers, and

21   we do dispute the qualitative aspects of it, there is no

22   question about that, we say that there is no quoting of the

23   heart of any letter.  We dispute this paraphrasing concept.

24   We say it is his own expression.  With the Sublette, we say

25   that you have enough before you to deny the application for

 1    injunctive relief at this time and then go on on the merits

 2    as to whether or not there is a claim for damages based on

 3    the copyright law. I would agree with you that the merits

 4    themselves are going to relate to a comparison.

 5                THE COURT:  Discussion off the record.

 6                (Discussion off the record)

 7                THE COURT:  I am not sure I understand you.  If

 8    the plaintiff has made out a copyright infringement, isn't

 9    the plaintiff entitled to an injunction?

10                MR. CALLAGY:  I don't think so based on these

11    facts.

12                THE COURT:  When you say based on these facts, a

13    part of what you mean is that the plaintiff hasn't shown a

14    copyright infringement.  Supposing that there was a

15    copyright infringement, why wouldn't the plaintiff be

16    entitled to this?

17                MR. CALLAGY:  They would have to show

18    irreparable harm.  To the extent they have a strong

19    likelihood of success on the merits, which I dispute, that

20    is only one element of the four-pronged test as to whether

21    you are entitled to relief.

22                THE COURT:  Let's say that part of the element

23    of harm is that the plaintiff either wants not to publish

24    the letters or, in any event, wants to control the right of

25    first publication, so that if they are published he wants

eo

1   them to be published by virtue of his agreement with some

2   publisher in a book that he has some control over which is

3   J. D. Salinger's publication of his letters, rather than

4   being brought out in somebody else's biography that he

5   doesn't like and doesn't want any part of.  It doesn't seem

6   to me to be too hard to find irreparable harm if there is a

7   copyright infringement.

8         Do you disagree with that?

9         MR. CALLAGY:  That is exactly the claim in

10  Merropol.  They said, we want to bring out the letters

11  ourselves and we don't want you to do it and despite that

12  claim the court denied relief.

13        MR. FOWLER:  In the Rosemont case there was a

14  preliminary injunction that was issued by the district

15  court that was eventually vacated even though there was

16  substantial use of a previously copyrighted article or

17  series of article.

18        MR. CALLAGY:  The court there said in balancing

19  the equities at this time in our opinion the public

20  interest should prevail over the possible damage to the

21  copyright owner.

22        It is cited at 366 Fed. 2d, 303, page 309.

23        MS. PAUL:  The Rosemont case was with respect to

24  already published works.  Look Magazine, I believe, and Mr.

25  Hughes had bought up the copyright after the article was

eo

54

1 | published.

2 | THE COURT: What was the public interest that

3 | the court was referring to? What is Rosemont?

4 | MR. CALLAGY: A biography of Howard Hughes.

5 | THE COURT: What was the claimed copyrighted

6 | material?

7 | MR. FOWLER: It was a series of articles that

8 | had been in Look Magazine and it was a description of his

9 | life. It was biographical material of Howard Hughes. In

10 | an attempt to essentially stop any biography of him he went

11 | out and he bought up these works and then he asserted the

12 | copyright claim as against them.

13 | MS. PAUL: Very different.

14 | MR. FOWLER: I don't think it is very different

15 | at all.

16 | THE COURT: I would think that -- I don't know.

17 | In the Merropol case the persons claiming the copyright

18 | interest were not authors. The decision may have been

19 | affected to some degree by a perception of the court that

20 | this was not really a copyright claim, but an attempt to

21 | try and use the copyright laws to prevent the publication

22 | of something that is of substantial historical interest.

23 | Now--

24 | MR. CALLAGY: I say that is what this case is

25 | about.

eo

1          THE COURT:  You are claiming that is what this

2    case is about, too, but at least J. D. Salinger's stand

3    being as an author is higher than that of the Merropols.

4          MR. CALLAGY:  These were letters that Julius and

5    Ethel sent to each other when they were on death row and

6    they did mention the children.

7          THE COURT:  It was the Rosenbergs' letters or

8    the Merropols' letters?

9          MR. CALLAGY:  The Rosenbergs' letters to each

10   other which when they died went to their children.

11         THE COURT:  It was a claim of the heirs of the

12   copyright owner.

13         MR. CALLAGY:  But they claimed specifically that

14   they had a contract, I think it was with Morrow to publish

15   those letters and they felt that there would be property

16   damage if Nizer published the Implosional Conspiracy and

17   the court said no.  That that is not -- those rights are

18   not sufficient to preclude publication.

19         THE COURT:  think that the first thing I have to

20   decide is whether to grant a TRO and I propose to make that

21   decision later in the course of the afternoon.  I want to

22   read schedule O, the comparisons, and look at these

23   materials a bit further.

24         If I don't grant the TRO, does that moot the

25   lawsuit?

eo

1           MS. PAUL:  Your Honor, it doesn't moot the

2    lawsuit but --

3           THE COURT:  Moot the injunctive aspects?

4           MS. PAUL:  We will have to get an appeal of the

5    denial done over the weekend since they have advised us

6    that they plan to ship on Monday.  So, yes, your Honor, if

7    it doesn't moot the preliminary injunction motion, it

8    certainly, you know, I don't know when they are going to

9    ship beyond review copies.  I know they are shipping review

10   copies on Monday.  It may well be that there will be

11   several days or weeks after that before they ship to

12   wholesalers or distributors.

13          THE COURT:  Is it fair to assume that from now

14   until 6 o'clock this evening the status quo will not be

15   disturbed?

16          MR. CALLAGY:  That is right.

17          THE COURT:  So that if I were to grant the TRO,

18   granting it at 6 o'clock would be the same thing as

19   granting it right now?

20          MR. CALLAGY:  Right.

21          THE COURT:  Nothing would happen in the meantime.

22          Let me just look at the terms of the TRO.  I

23   glanced at them before and I must say they raise some

24   questions.  I understand the part of the application that

25   relates to publishing, distributing, marketing and

eo

1   otherwise disseminating, but I am a little curious about

2   advertising and licensing.

3          MS. PAUL:  I haven't seen any advertising yet,

4   but we have seen the catalogs, which were circulated and

5   circulated in interstate commerce, and they make reference

6   to the fact and feature the fact that it would include

7   Salinger's letters.

8          MR. CALLAGY:  We made advertising commitments.

9          THE COURT:  What difference does that make?

10  Supposing that they advertise that they were going to -- I

11  don't understand.  The advertisement doesn't violate any

12  right that Salinger has?

13         MS. PAUL:  I agree with you, the advertising in

14  and of itself would not.  I am concerned about what if they

15  did in the advertisement, for instance, that contained a

16  quotation from the letters or a section of the book as a

17  tease which is a portion of the material that we challenge

18  here.  I think your Honor is correct.

19         THE COURT:  That would be covered by "otherwise

20  disseminated."

21         MS. PAUL:  I also would like the record to

22  reflect that to the extent that they choose to go ahead

23  with and honor commitments to honor advertising, that

24  should a TRO or preliminary injunction issue, I would think

25  that at this point, if not a lot earlier, they are going

eo

1    ahead at their own risk and that certainly any bond or any

2    damages which might be incurred with respect to anything

3    that they are doing at their own risk should not include

4    any such advertisements if they go forward.

5              Did I state that right?  I am merely saying that

6    I believe that this book should not go forward in the form

7    that it presently is.

8              THE COURT:  They say they have advertising

9    commitments by which you mean contracts that you are

10   liable --

11             MR. CALLAGY:  We would be liable for.

12             THE COURT:  For example, The New York Times

13   Sunday Book Review, you have incurred obligations to them

14   to pay for advertising space?

15             MR. CALLAGY:  At a given time.

16             THE COURT:  You would be liable to them if you

17   pulled that out?

18             MR. CALLAGY:  That is right.

19             MS. PAUL:  They would be liable to pay us for

20   the ad.  I don't know what other liability there could be.

21   If you are concerned about your bond, you have much less to

22   be concerned about if I don't enjoin them from advertising

23   than if I do.  If they incur lots of liability for ads that

24   then can't be published, I don't know what this kind of

25   advertising costs, but what kind of numbers are we talking

eo

1    about, $10,000, $8,000?

2             MR. CALLAGY:  I don't know.

3             MS. PAUL:  Your Honor, I would like the record

4    to reflect the fact that they have known since we objected

5    June 1 to the May galleys that there was a problem here and

6    I would be very surprised, since they pulled the book and

7    revised the book and we weren't even sure they were going

8    to come up with a new version of the book, they made these

9    commitments.

10            I am not disputing your point that there are

11   certain kinds of advertisements that we do not need

12   injunctive relief with respect to and I do not dispute your

13   point that to the extent that they want to go ahead and run

14   advertisements on the strength of their belief that they

15   can go forward with this book, that's their risk.

16            I would just like the record to reflect that

17   they have made these commitments and set this up in such a

18   way knowing full well of Salinger's position and to now say --

19            THE COURT:  So what?  One isn't required to stop

20   dead in ones tracks because of somebody who objects.

21            MS. PAUL:  No, but I would like the record to

22   reflect that they knew of our position at the time they

23   made those commitments.  Having said that I am willing to

24   say that we don't need an injunction against advertising

25   except insofar as advertisements should not in any way do

eo                                                                     60

1    the very things that we seek to have enjoined.

2              THE COURT:  That is covered by "otherwise

3    disseminated."

4              MS. PAUL:  Otherwise disseminating a book

5    currently entitled or excerpts thereof, yes.  By excerpts

6    thereof --

7              THE COURT:  What about licensing?

8              MS. PAUL:  Licensing, your Honor, again we

9    understand that there is a license in effect with The New

10   York Times to publish first serial rights in The New York

11   Times magazine.  Am I correct in my understanding that that

12   is to appear prior to the time the book is published?

13             MR. CALLAGY:  That is my understanding.

14             THE COURT:  Is it to appear prior to the public

15   date?

16             MR. CALLAGY:  I don't know that.

17             THE COURT:  I guess licensing I understand.

18   Licensing could lead the licensee to believe that the

19   license is to publish immediately.  I guess license is okay.

20             Then you say "excerpts thereof."  That seems to

21   me to be broader than is appropriate.

22             You don't claim that there isn't anything in the

23   however many hundred pages of that book that can't be

24   excerpted?

25             MS. PAUL:  Certainly not.  You just pointed out

eo

1   advertisements and also with respect to first serial rights

2   and other forms of licenses that they not get around the

3   language of the order by taking portions that include the

4   Salinger material.

5           THE COURT:  Excerpts thereof is too broad.  It

6   should be excerpts thereof which contain--

7           MS. PAUL:  References to the Salinger letters

8   for the time being.

9           MR. CALLAGY:  Not references.

10          THE COURT:  That is too broad also.

11          MR. CALLAGY:  Your Honor, we already have

12  licensed the work.

13          THE COURT:  That's okay.  This is an order that

14  if I sign it will be prospective.  I think you ought to

15  think up some more narrow language than "excerpts thereof."

16  It can start with excerpts thereof but then it requires

17  some subdefinition.

18          MS. PAUL:  My problem, your Honor, is there is a

19  dispute between us as to what is and what is not a

20  paraphrase or is copying.

21          THE COURT:  How about excerpts thereof

22  containing quotation or paraphrase of copyrighted material

23  of the plaintiff.

24          MS. PAUL:  Putting the risk on them if they

25  differ with our interpretation of what is or is not

eo                                                                     62

1    paraphrase.  I don't know if I were representing a

2    defendant I would be happy with that kind of language,

3    given the fact that I wouldn't know whether or not

4    something was paraphrased, but I certainly from the

5    plaintiff's point of view here don't have any problem with

6    that.

7                 THE COURT:  Do you have a problem?

8                 MR. CALLAGY:  I have a problem with the whole

9    concept.

10                THE COURT:  I am not saying I am going to enter

11   the order, but I am saying if I do enter it, I am

12   suggesting that the order prepared by the plaintiff is too

13   broad and you are entitled to have it narrowed.

14                As a form of narrowing I suggested the possible

15   appropriateness of excerpts thereof containing quotation or

16   paraphrase of copyrighted material of the plaintiff.

17                Is that something--

18                MR. CALLAGY:  If you feel it is an impermissible

19   quotation and an impermissible paraphrasing, certainly that

20   would be consistent with the order.

21                THE COURT:  In other words, I am trying to leave

22   you the permission, if I grant this order, to advertise the

23   book and to advertise it in a manner that includes

24   quotations from the book so long as your quotations are not

25   also quotations of Salinger's letters or a violation of his

eo

63

1    copyright by paraphrase of his letters.

2            MR. CALLAGY:  Effectively you will be precluded

3    because their argument is that the whole book is really a

4    paraphrase.

5            THE COURT:  That is not really their argument.

6            MR. CALLAGY:  That is what they told me.

7            THE COURT:  That is hyperbole.

8            MR. CALLAGY:  That is what I see as the problem.

9            THE COURT:  They say that no book that anybody

10   would buy without it, but they are not saying--

11           MR. CALLAGY:  They told me if you take out the

12   quotes and if you take out what we say is paraphrase there

13   is no book.

14           THE COURT:  Can you suggest preferable language

15   in the event that I enter this order?

16           MS. PAUL:  The trouble with paraphrase is that

17   it ducks the issue here of whether or not this is

18   paraphrase.  If they publish it, we will not be in

19   violation -- well, the bottom line is that there has to be

20   some other language that we can mutually come up with

21   should you decide to enter the order.  I think we are all

22   agreed on what we want to accomplish.  The question is how

23   to phrase it.

24           THE COURT:  Another way is to put it in -- often

25   these injunctions are put in question-begging terms and I

1    agree that the one that I formulated did have an element of

2    question begging in it, but you could say simply excerpts

3    therefrom that would violate any copyright of the plaintiff.

4                MS. PAUL:  Which again puts the burden on them.

5                MR. CALLAGY:  Yes.

6                MR. BOOSE:  In that case if you use a five word

7    quote, then where do we stand on that kind of a quote in an

8    ad because then we have a whole argument as to whether five

9    words taken out of context is fair use or not?

10               THE COURT:  You liked better what I said before,

11   excerpts thereof that include either quotation or

12   paraphrase of copyrighted material of the plaintiff?

13               MS. PAUL:  Yes.

14               MR. BOOSE:  I think we can live with that.

15               MR. CALLAGY:  We could live with the latter,

16   which would violate any copyright of the plaintiff or which

17   would exceed permissible fair use.

18               MS. PAUL:  They are going to argue that you have

19   to look at the number of words used in relation to the

20   number of words in the advertisement.  I can just see that

21   argument coming.  Then they are going to say it is

22   obviously a fair use because there are only 20 words in the

23   advertisement and only ten of them are from Salinger.

24               THE COURT:  What did you say, Mr. Boose?  You

25   want to limit it further?

eo

```
 1          MR. BOOSE:  We are talking about materials
 2   complained of because we don't agree as to whether this is
 3   paraphrase or not, but it seems to me until the decision is
 4   made there should be an injunction against those materials
 5   being distributed that would characterize them as
 6   paraphrasing or copyright infringement does beg the
 7   question.
 8          THE COURT:  I don't think it is possible at the
 9   TRO stage to avoid a certain amount of question begging in
10   the formulation of this kind of injunction because -- it
11   just isn't possible.
12          All right.  I will during the afternoon study
13   these materials further and I guess by about 5 to 6 o'clock
14   I should be prepared to let you know whether I have granted
15   a TRO or not.
16          What about a bond in the event I do grant one?
17          MR. CALLAGY:  I think the damages will be
18   substantial.
19          THE COURT:  The only issue in a TRO is whether
20   there should be a delay.  A TRO is just a temporary thing
21   prior to the consideration whether there should be a
22   preliminary injunction.
23          It is by no means unusual to have a grant of a
24   TRO but denial of a preliminary injunction when more light
25   is shed on the question.  The problem sometimes is that
```

eo

1    with very little notice and little in the way of facts the

2    status quo order is not terribly harmful whereas a denial

3    of that order effectively moots the case and gives

4    virtually total victory to one side.  That may be the case

5    here.

6            MR. CALLAGY:  I think what you have before you

7    is pretty much what you would have in any preliminary

8    injunction hearing.  I might add, however, that Mr.

9    Salinger it may turn out if he was deposed that indeed he

10   has given permission to others and there are many more

11   letters that exist than he is aware of, but at least for

12   our general purposes I think you pretty much have

13   everything and that is why the TRO is so critical.

14           It seems to me if you grant the TRO here,

15   historians and authors are going to be --

16           THE COURT:  I have 600 or 700 pages of material

17   here in front of me and I have several conferences this

18   afternoon.  If you are right that I've got all the material

19   before me that I need to make the decision, that doesn't

20   necessarily mean that I would be able to give enough

21   consideration to it by 6 o'clock this afternoon.  It may be

22   that the TRO would only last for two days.  It may be--

23           MR. CALLAGY:  You know what happens at least my

24   experience is if somebody gets one, then before you know it

25   it is in place.  I can't see any case that would grant a

eo

67

1      TRO under these circumstances.

2              MS. PAUL:  Your Honor, if I can respond to the

3      question that I thought you asked.  It seems to me what we

4      are talking about is what, if any, is the maximum damage

5      which the defendants will suffer if they cannot ship their

6      review copies for a maximum of ten days under the Federal

7      Rules.  That is really the issue that we have been asked to

8      address.

9              I submit that the damage is not great and that

10     only a nominal bond should be set.  I submit the damage is

11     not great particularly since your Honor pointed out, you

12     said they can go ahead and advertise.  What they are

13     talking about is review copies only, as I understand it,

14     with respect to Monday and that they have already shipped,

15     unfortunately, some review copies last time around and they

16     have delayed three months at this point and I don't see

17     what real harm is going to come to Random House from

18     another delay in some period less than ten days at this

19     point.

20             Now, I recognize there is an affirmative

21     obligation for there to be a bond, but I think in these

22     circumstances and in the overall circumstances the bond

23     should be a nominal one.

24             MR. CALLAGY:  We have licensing commitments,

25     advertising commitments.

eo

1      THE COURT:  I have no power over advertisement

2   commitments.

3      MR. CALLAGY:  I don't know what the ads say, I

4   haven't seen them, but to the extent The New York Times

5   will say say, I made plans to run this and you have to

6   indemnify us.  I think there should be a bond to the extent

7   that any TRO is granted and I think I will leave that to

8   the discretion of the court.

9      THE COURT:  Okay, fine.

10      MR. CALLAGY:  If you look at Ian Hamilton's

11   affidavit and the Random House affidavit you will see that

12   expenses will be incurred and they will be substantial.  On

13   the other hand, Mr. Salinger is an individual.

14      Mr. Hollingsworth is here.  What is your thought

15   on that the type of bond?

16      MR. HOLLINGSWORTH:  There is a risk in a TRO

17   situation like this where you have license agreements out.

18   The licensees might cool on the project and back off,

19   cancel those license agreements.

20      THE COURT:  Who are we talking about?

21      MR. HOLLINGSWORTH:  Two book clubs and a first

22   serial license.  In addition, Ian Hamilton, who is a party

23   to this suit and who presumably will be affected by the TRO,

24   has independently made a commitment to a British publisher

25   where the potential is for cancellation of that agreement.

eo

1    They already have canceled a serial agreement because of

2    approaches by plaintiff's counsel to the British serializer.

3            MS. PAUL:  Your Honor, first of all, I don't

4    understand how Random House could claim that it damages

5    them if something happens in England that they are not a

6    party to.  Second of all, we have an agreement with

7    Heineman, the publisher in England, that they will not do

8    anything with the manuscript until they give 15 days notice

9    to the counsel we are using in England.  Apparently nothing

10   can happen at least within 15 days, so clearly nothing is

11   going to happen in England in the next 15 days because

12   there is an agreement that it will not.

13           THE COURT:  It seems to me very unlikely that

14   the grant of a TRO, which is valid only for a few days, is

15   going to cause anybody to back out of licensing agreements.

16   If anything, if I do grant the TRO, it will probably help

17   sell the book in the event that the plaintiff is ultimately

18   unsuccessful in preventing the publication of the book.  It

19   would probably just add publicity, free publicity to the

20   book and make it a hotter property.

21           We are talking about an order of short duration.

22   No one has told me yet anything that strikes me as any very

23   substantial risk of loss that is imposed on the publisher

24   or the author by the TRO.  A preliminary injunction were

25   granted a few days later, that might appropriately call for

1    a substantially larger bond because that might have much

2    more serious consequences or more damaging consequences for

3    the publishers.  All we are talking about is a brief delay.

4    You haven't told me anything that suggests--

5              MR. CALLAGY:  To the extent you lose a license,

6    you lose a sale, I would think at a minimum we are talking

7    $100,000.

8              MS. PAUL:  Your Honor, they haven't put anything

9    before the court with respect to the effect that they are

10   likely to lose a license, might be likely to lose a license.

11   How much money they are supposed to be getting for any of

12   these licenses, whether any of the licensees that are in

13   issue that are licenses through Random House in this

14   country have indicated any unwillingness.  It seems to me --

15             THE COURT:  Let's talk about something else.

16   What about a schedule for the submission of the preliminary

17   injunction?  It seems to me that I think that or my guess

18   is that Mr. Callagy is right, that on a preliminary

19   injunction you are unlikely to be adding very much to what

20   you have already submitted.  Maybe that will turn out to be

21   wrong, but do you agree that the dispute is pretty much

22   before me here?

23             MS. PAUL:  Basically, your Honor, yes.  I am not

24   saying there isn't some additional material and/or reply

25   comments to some of their papers and I assume that works

eo

1   both ways.

2              THE COURT:  I am not talking about briefing.  I

3   am talking about factual material.

4              MS. PAUL:  Factual material, from my perspective

5   right now it would be very limited.  We might put in a

6   little bit more, but I do think the heart of it is

7   basically before you.

8              THE COURT:  What about a schedule for this?  It

9   seems to me what there should be for the preliminary

10  injunction is a submission rather than a hearing on live

11  testimony.

12             MS. PAUL:  I agree.

13             MR. CALLAGY:  I would like to a take Mr.

14  Salinger's deposition.

15             MS. PAUL:  Given the issues in this case, I

16  don't know why you need Mr. Salinger's deposition.  What

17  issue is in any way relevant based on your papers or our

18  papers having to do with anything before the court on a

19  preliminary injunction do you need his deposition?

20             MR. CALLAGY:  He claims, first of all, that he

21  just found out about the existence of these letters and the

22  existence of works like Sublette.  I want to know what the

23  universe of letters out there really is. I want to know to

24  whom he has given permission.

25             MS. PAUL:  I don't see how that is relevant.

1           MR. CALLAGY:  It is relevant on the issue of

2    fair use.  He may have said, you are free to use this

3    material.

4           MS. PAUL:  How does that affect Random House's

5    right to use material in this particular book?

6           MR. CALLAGY:  I am entitled to know what the

7    universe is.

8           THE COURT:  Can I get back to my question

9           MS. PAUL:  I am sorry, Judge.

10          THE COURT:  My question is what would be an

11   appropriate date?  It seems to me that if I do grant the

12   TRO the defendant is concerned to have a speedy submission

13   of the preliminary injunction.  If I don't grant the TRO

14   the plaintiff is interested in having a speedy submission

15   of the TRO so either way both of you -- well, either way

16   one of you is going to want the preliminary injunction to

17   be considered as rapidly as possible.

18          I would suggest that you without delay collect

19   the material by discovery or otherwise that needs to be

20   considered on the preliminary injunction and we set a date

21   for the subapplication of the entire record and briefing on

22   the preliminary injunction regardless of whether I grant or

23   deny the TRO.

24          What do you suggest that date be?

25          MS. PAUL:  I would say that the maximum amount

1     of time we need would be two weeks maximum.

2            THE COURT:  Two weeks to make the

3     Subapplication?

4            MS. PAUL:  Yes, sir.  I understand that should

5     you grant the TRO, unless Mr. Callagy agrees, it is ten

6     days, but I would think that two weeks or less.

7            MR. CALLAGY:  I think two weeks is fine but, as

8     I said, I do want particularly on the issue of fair use to

9     take Mr. Salinger's deposition.

10           MS. PAUL:  Your Honor, this is going to be an

11     application that is going to be back before you.

12           MR. CALLAGY:  Maybe we should have it heard now.

13           MS. PAUL:  I think Mr. Callagy and I can talk

14     about it, but I don't see  --

15           THE COURT:  Why unfair use?  I can see your

16     taking his deposition on lots of things, but I don't see

17     what it has got to do with fair use?

18           MR. CALLAGY:  One of the issues is what is the

19     damage to the letters.

20           THE COURT:  What does he know about fair use?

21           MR. CALLAGY:  One of the determinants in fair

22     use is whether there is going to be any damage and if I

23     found out in discovery that he has contracted to publish

24     the letters or if I found out that he said I will never

25     publish these letters, I want them destroyed.  In fact, I

eo

74

1    have written to various libraries asking them to destroy

2    them on my death.

3              MS. PAUL:   What difference does that make one

4    way or the other?

5              MR. CALLAGY:   Judge Leval raised that very point

6    during our presentation.   That is what distinguishes this

7    case in part from the Nation case.   This is not the gun

8    jumping.   This is a situation where basically Salinger is

9    preventing the public from access to this material.

10             THE COURT:   I think the defendant should be

11   entitled to take the deposition.   There are certain

12   subjects that the defendant is entitled to ask, but I would

13   add that, as I have ordered the sealing of these things

14   here, I think the same order could be made for the

15   deposition.   That it is being conducted solely for purposes

16   of litigation.   That it should be -- if that is your

17   concern--

18             MS. PAUL:   I also just think it is harassment,

19   frankly, but if your Honor is ruling that the deposition

20   can go forward, then we will have no choice but to produce

21   him and we will do so and within the time frame.

22             THE COURT:   What do you say about the time

23   period?

24             MR. CALLAGY:   I think that time period is fine.

25             THE COURT:   Two weeks. The court has the power

1    to extend the ten days for another ten days. If both of

2    you think that you need as much as two weeks, we can make

3    it two weeks. That means that if I grant the TRO, I will

4    grant it not just for ten days but for two weeks. I am

5    willing to make it an earlier date if you want an earlier

6    date.

7           MS. PAUL: Your Honor, I am perfectly happy to

8    do it at an earlier date, but if he is taking Mr.

9    Salinger's deposition, it is going to take a while to get a

10    transcript and get that transcript worked into whatever

11    submission we make.

12           THE COURT: Off the record.

13           (Discussion off the record)

14           THE COURT: On the record.

15           MS. PAUL: We have been talking about scheduling,

16    you know, for a two week period regardless of whether the

17    TRO is denied or granted. The information that we have to

18    date is that review copies will be shipped on Monday and

19    that shipment of the book will be made shortly thereafter.

20    Are you able to provide any further information with regard

21    to your plans to ship beyond review copies?

22           MR. CALLAGY: No, not at this time. My

23    understanding is that normally, as you know, once the

24    review copies go out, the books are shipped to the

25    bookstore thereafter and I don't know what the gap is going

eo

1   to be.

2         Are you saying that you don't care about the

3   review copies but--

4         MS. PAUL:  I certainly care about the review

5   copies, but the question is assuming the temporary

6   restraining order were not to be granted, further damage

7   would be done by shipping beyond the review copies and I am

8   just trying to ascertain whether that is something that is

9   going to be a matter of days, a matter of weeks or as much

10   as a month because we are agreeing to a two week hiatus,

11   which cuts two ways depending on which way the judge rules.

12   I wondered if you had plans as to when you were going to

13   ship beyond shipment of review copies?

14         MR. CALLAGY:  Are you saying you would like to

15   accelerate the schedule varies.

16         MS. PAUL:  Depending upon your response to that

17   question.

18         MR. CALLAGY:  I would be prepared to take Mr.

19   Salinger's deposition tomorrow.

20         MS. PAUL:  I am not going to be prepared to take

21   Mr. Salinger's deposition tomorrow.  It is a Jewish holiday.

22         MR. CALLAGY:  I'm sorry.

23         THE COURT:  Off the record.

24         (Discussion off the record).

25         MR. CALLAGY:  Thank you very much.

eo                                                                      77

1                    MS. PAUL:  Thank you very much, Judge.

2                              o0o

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Ex. B

| DIST. | OFF. | DOCKET | | FILING DATE | | | J | N/S | O | D | | R | $ DEMAND | JUDGE/ | COUNTY | JURY | DOCKET |
| | | YR. | NUMBER | MO | DAY | YEAR | | | | PTF | DEF | 23 | | MAG. NO. | | DEM. | YR. NUMBER |
| 208 | 1 | 86 | 7574 | 10 | 3 | 86 | 3 | 820 | 1 | | | ✓ | Nearest $1,000  J 0867 M | 88888 | P | 86 | 7574 |

| PLAINTIFFS | DEFENDANTS | LEVAL J. |
|---|---|---|
| SALINGER, JEROME D.  a/k/a SALINGER , J.D., | RANDOM HOUSE, INC and IAN HAMILTON, | |

**CAUSE**                                                                           jst

(CITE THE U.S. CIVIL STATUTE UNDER WHICH THE CASE
IS FILED AND WRITE A BRIEF STATEMENT OF CAUSE)

Copyright infringement  17 USC Sec 501 et seq, Lanham Act 15 USC Sec 1125 (a) breach
of contract etc...

**ATTORNEYS**

Kay Collyer & Boose
One Dag Hammarskjold Plaza
NY, NY  10017
212  940 - 8200

Satterlee & Stephens
230 Park Avenue
NY, NY 10169
212 818 9200
  by: James F. Rittinger
      Robert M. Callagy

| CHECK HERE IF CASE WAS FILED IN FORMA PAUPERIS | FILING FEES PAID | | | STATISTICAL CARDS | |
|---|---|---|---|---|---|
| | DATE | RECEIPT NUMBER | C.D. NUMBER | CARD | DATE MAILED |
| | | 135431 | | JS-5 JS-6 | 5-31-88 |

UNITED STATES DISTRICT COURT DOCKET                                                  DC-111 (Rev. 9/81)

86 Civ 7574        Salinger v    Random House        86 Civ 7574  PNL

| DATE | NR. | PROCEEDINGS                                                                                                       J. Leval |
|------|-----|-------------------|

| DATE | NR. | PROCEEDINGS |
|------|-----|-------------|
| 10/3/86 | 1 | Filed Complaint - issued summons & notice purs to 28 USC 636 (c), jury trial demand |
| 10/6/86 | 2 | Filed Order, for the reasons noted, The TRO is granted.    So Ordered: Leval J. |
| 10/6/86 | 3 | Filed OSC with TRO, ordered that defts Random House and Ian Hamilton show cause in Room 506, US Courthouse, Foley Sq, NY, 11 AM on 17 October 1986, why an order should not be entered preliminarily enjoining and restraining the defts Random Hous and Hamilton etc.... from publishing, advertising, distributing etc.... a book currently entitled, J.D. Salinger: A writing Life or excerpts thereof.... Ordered that pltf may file Exh C, D-1, - D -5, M and O under seal etc.... Leval J. |
| 10/6/86 | 4 | Filed Notice of Dep of Harold Ober Assoc, 8 Oct 1986,   sub iss. |
| 10/6/86 | 5 | Filed Aff of Personal Service of OSC w/TRO, opinion of J. Leval, to: firm of Satterlee & Stephens, 230 Park Av, NY, NY on Oct 4, 1986., and also identical copie of these papers to deft Hamilton, 18 Dorset Square, London, England, by mail, on Oct 4, 1986. |
| 10/6/86 | 6 | Filed Bond No. 129412, Seaboard Surety Co, TRO, pltf, amount of $5,000.00, |
| 10/6/86 | -- | Mailed notice to REgister of Copyrights, Library of Congress, Wash, DC  20559 |
| 10/8/86 | 7 | Filed Order, The application for a TRO will be decided this afternoon. (10/3/86, 2:4 PM. It is understood that the deft will not alter the status quo in the intervening time. The hearing on the prelim inj issue will be by submission. Discovery is to be expedited. The parties having requested 2 weeks for submission of the materials constituting the hearing, these materials together with supporting briefs will be f by Oct 17, 1986 by 11 AM, and certain materials as indicated are ordered sealed and may not be used except in the litigation,   So Ordered:   Leval J.   cmc. |
| 10/20/86 | 8 | Filed pltf Affidavit of Phyllis Westberg. |
| 10/20/86 | 9 | Filed pltf Affidavit of M. Graham Coleman 2d. |
| 10/20/86 | 10 | Filed pltf Statement purs  to civil rule 3 (g). |
| 10/16/86 | 11 | Filed one (1) Env ordered sealed & impounded per ord of PNL 10/16/86. |
| 10/20/86 | 12 | Filed one (1) Env ordered sealed & impounded per order of PNL 10/3/86. |
| 10/20/86 | 13 | Filed one (1) Env ordered sealed & impounded per order of PNL 10/20/86. |
| 10/22/86 | 14 | Filed defts Statement of undisputed material facts purs to local rule 3 (g). |
| 10/28/86 | 15 | Filed deft Notice of deposition of Dorothy Olding, a non-party witness on 17 Novemb 1986. |
| 10/28/86 | 16 | Filed Deft Random House ANSWER.                                                                S&S |
| 10/28/86 | 17 | Filed Deft Ian Hamilton ANSWER.                                                                 S&S |
| 11/6/86 | 18 | Filed OPINION and ORDER No. 60115, for the reasons stated in this opinion and order and upon all the factors, the application for a preliminary injunction is DENIED.        So Ordered:  Leval J.   cmc |
| 11/10/86 | 19 | Filed ORDER, for the reasons noted in this order, Judge Leval grants an injunction pending appeal only for a week.  It is my ruling (and recommendation) that further stay be denied.  The stay granted is only to allow pltff a chance to make the application to a higher court. Defts have agreed to waive the notice period of the Court of Appeals so that the application for a further stay may be heard next week if served by the evening of Nov 10, 1986.  Defts distribution of the book is accord stayed through Nov 13, 1986.  Further stay is denied.     So Ordered: Leval J. cmc |
| 11/10/86 | 20 | Filed J. D. Salinger, pltf, NOtice of Appeal from opinion and order filed 5 Nov 198 Mailed copies to: Kay Collyer & Boose, One Dag Hammarsjold PLaza, NY, NY 10017, on 11/12/86, Satterlee & Stephens, 230 Park Avenue, New York, NY 10169, 11/12/86. |
| 11/12/86 | -- | Forwarded copy of Notice of Appeal to District Judge and copy of Notice of Appeal and docket entries to Court of Appeals. |
| 11/12/86 | 21 | Filed true copy of NOtice of Motion, USCA, 2nd Circuit, the temporary stay pending |

disposition of this motion is continued until Wed, Nov 19, 1986, Elaine B. Goldsmith

DC 111A
(Rev. 1/75)

FPI—NAR—7-14-80-70M-4398

## CIVIL DOCKET CONTINUATION SHEET

| PLAINTIFF | DEFENDANT | 86 Civ 7574  PNL |
|---|---|---|
| Salinger | Random House | DOCKET NO. |
| | | PAGE 3 OF ____ PAGES |

| DATE | NR. | PROCEEDINGS | J. LEVAL |
|---|---|---|---|
| 11-30-86 | 22 | Filed transcript of record of proceedings dated _Oct-3, 1986_ | |
| 11/26/86 | 23 | Filed Order, The opinion and order of Nov, 1986 (No. 60115) is corrected as indicated on the attached copy of P. 19, So Ordered: Leval J.    cmc | |
| 2/20/87 | 24 | Filed pltf Notice of Motion to vacate and/or reargue, ret: 3 Mar 1987. | |
| 2/20/87 | 25 | Filed pltf memo of law in support of motion to vacate and/or reargue. | |
| 2/20/87 | 26 | Filed Prelim inj, ordered that defts etc, are preliminarily enjoined and restrained pending trial and determination of this action etc.,,, pltf shall continue in full force etc, bond, posted herein, sum of $5000.00.  Leval J. cmc | |
| 2/23/87 | 27 | Filed Order, filed herewith under seal₊** are the district  court's rulings underlying the Opinion and Order of Nov 5,1986, as to the pltffs specifications of infringement. So Ordered: Leval J. cmc, * The passages from Salinger's letters and the Hamilton biography are filed under seal to protect Salinger's right of first publication. ** This filing shall be available only  to counsel of record for the parties. (Salinger,Random House and Hamilton. | |
| 2/23/87 | 28 | Filed One (1) env ordered sealed and impounded per order of PNL 2/18/87. | |
| 2/27/87 | 29 | Filed defts memo of law in opposition to motion to vacate and/or reargue. | |
| 2/27/87 | 30 | Filed defts affidavit of Robert M. Callagy. | |
| 3/10/87 | 31 | Filed MEMORANDUM and ORDER, the Court will grant pltff application and vacate the order of Feb 18, 1987 and will withhold  the filing of my detailed findings until the appellate   round concerning the prelim inj is terminated and the case returns to the district court  for consideration of a permanent  injunction. Counsel may, in the meantime, keep and refer to the court's table.  It may not, however, be identified as a ruling of this court. The order of Feb 18, 1987 is hereby vacated.   So Ordered: Leval J. cmc. | |
| 4/6/87 | 32 | Filed True Copy of MANDATE,  USCA for the Second Circuit, Ordered adjudged and decreed that the Order of said District Court be and it hereby is reversed and the action be and it hereby is remanded to the district court  for further proceedings consistent with the opinion of this court with costs to be taxed against the appellees.  Elaine B. Goldsmith, Clerk, EOD 4/7/87,   cy to PNL | |
| 4/24/87 | 33 | Filed Order,The Court of Appeals having issued its mandate temorarily restoring jurisdiction  to the district court for the limited purpose of having the said district court decide whether to add to the record its detailed notations of findings as to pltffs specifications of infringement, it is Ordered that the court's rulings, originally filed by order of Feb 18, 1987, and withdrawn by order of March 9,1987, are hereby added to the court's record.   Leval J. cmc | |
| 4/27/87 | 34 | Filed Notice to the docket clerk, lst supplemental record transmitted to the - USCA Second Circuit, 27 April 1987. | |
| 4/28/87 | 35 | Filed letter to Clerks Office, Dist Court, SDNY, April 27, 1987 fr: USCA, second cicuit, by: Michael Wasserman, Deputy Clk, pertaining to MANDATE, USCA, in this action, (docketed at request of O & A, USDC, SDNY. | |
| 7/16/87 | 36 | Filed true copy of MANDATE, USCA, Second Cir, On consideration whereof, it is now hereby ordered, adjudged and decreed that the ORDER of said district court be and it hereby is reversed and the action be and it hereby is remanded to the district court with costs to be taxed against the appellees. Elaine B, Godsmith, Clerk  EOD  7/16/87                                       JST | |

DC 111A
(Rev. 1/75)

CIVIL DOCKET CONTINUATION SHEET

FPI—MAR—7-14-80-70M-4398

| PLAINTIFF | DEFENDANT | DOCKET NO. _____ |
| | | PAGE ___ OF ____ PAGES |

| DATE | NR. | PROCEEDINGS |
|------|-----|-------------|
| 5-31-88 | 37 | Fld stip and order of discontinuance, this Action is hereby discontinued, etc.. LEVAL,J.                                                                                            LA |

# Ex. C

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| APPLICATION OF RICHARD CAPLAN REGARDING <u>SALINGER v. RANDOM HOUSE, INC.</u>, 86 Civ 7574–PNL (S.D.N.Y.) | Misc Case No. _____ |

**AFFIDAVIT OF RICHARD CAPLAN**

Richard Caplan personally appeared before me, the undersigned notary public duly authorized by law to administer oaths in State of Georgia, who being duly sworn, deposes and states as follows:

1.

I am over the age of 18 and competent to testify as to the matters contained herein. The statements contained herein are based on my own personal knowledge and I believe them to be true and correct.

2.

I am conducting research on J. D. Salinger.

3.

I have endeavored to find material related to 86 Civ 7574–PNL (S.D.N.Y.) at archives of both the United States District Court for the Southern District of New York and the United States Court of Appeals for the Second Circuit.

4.

As part of that archival research, I have observed pages from Salinger's 1986 deposition in 86 Civ 7574 attached to dispositive motion(s).

1

5.

Outside of that archival research, in January 2026, a printed copy of Salinger's 1986 deposition transcript (complete save for page 189) was shared with me. I read that transcript then returned the copy.

6.

I would like to share portions of what I have of Salinger's deposition transcript as part of my research findings.

7.

I do not want to run afoul of any rulings of this court regarding Salinger's deposition and related materials.

FURTHER AFFIANT SAYETH NOT.

_Richard Caplan_
Richard Caplan

Sworn to and subscribed before me
this _29th_ day of _January_, 2026.

_Kimberly M. Pratt_
Notary Public _Kimberly M. Pratt_
My Commission expires _05-14-2029_

KIMBERLY PRATT
MY COMMISSION EXPIRES
NOTARY
PUBLIC
MAY 14, 2029
DEKALB COUNTY, GEORGIA

2